UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

DEFENDERS OF WILDLIFE; SIERRA CLUB;
THE HUMANE SOCIETY OF THE UNITED
STATES; NATIONAL PARKS CONSERVATION
ASSOCIATION; THE FLORIDA
BIODIVERSITY PROJECT; THE WILDERNESS
SOCIETY; WILDLANDS CPR; and BRIAN
SCHERF,

                Plaintiffs,

vs.                              Case No.  2:08-cv-237-FtM-29SPC

KEN   SALAZAR,   Secretary,   US
Department of the Interior; JONATHAN
JARVIS, Director, National Park
Service; DANIEL M. ASHE[1], Director,
US Fish and Wildlife Service,

                Defendants.
_____


## OPINION AND ORDER

        For the third time since 1995, the issue of the use of

motorized recreational off-road vehicles (ORVs) in the Big Cypress

National Preserve is before the Court.  The first case[2], initiated

by environmental interests, resulted in a Settlement Agreement,

while the second[3], initiated by ORV interests, resulted in summary

judgment in favor of the government agencies.  In the current case,

_____

        [1]Pursuant to Fed. R. Civ. P. 25(d), Daniel M. Ashe, the
current Director of the U.S. Fish and Wildlife Service, is
automatically substituted as defendant in his official capacity.

        [2]Florida Biodiversity Project v. Kennedy, Case No. 2:95-cv-50-
FtM-24SCB.

        [3]Wildlife Conservation Fund of Am. v. Norton, Case No. 2:01-
cv-25-FtM-29DNF.

environmentally inclined plaintiffs challenge the February, 2007 decision of the National Park Service to reopen ORV trails in the Bear Island Unit of the Big Cypress National Preserve.  Plaintiffs assert that the reopening of these trails violated: (1) the 1995 Settlement Agreement; (2) the National Park Service's 2000 ORV Management Plan; (3) the National Park Service Organic Act; (4) the Big Cypress Establishment Act; (5) Executive Order 11,644; (6) Executive Order 11,989; (7) the National Environmental Policy Act (NEPA); (8) the Endangered Species Act (ESA); and (9) the Administrative Procedure Act (APA).  The case is now before the Court on cross motions for summary judgment (Docs. #95, 103) and supporting and opposing memoranda and exhibits (Docs. #104, 106, 109, 113, 127).  The administrative record has been filed on two computer discs (Doc. #63), which will be referred to as "AR" followed by the page number.  The Court heard oral argument on January 9, 2012.  With the Court's permission, the defendants filed a Post-Hearing Brief on Remedy (Doc. #120) on January 17, 2012 and plaintiffs filed a Reply (Doc. #121) on January 23, 2012.  Plaintiffs filed two Notices of Supplemental Authority (Docs. #127, 129) on February 27, 2012 and April 16, 2012, to which defendants filed Responses (Docs. #128, 130).

# I. Relevant Environmental Statutes and Executive Orders

## A. National Park System and the National Park Service

The national park system in the United States began with the establishment of Yellowstone National Park in 1872. 16 U.S.C. § 1a-1. In 1916, the National Park Service Organic Act created the National Park Service (NPS) within the Department of Interior. 16 U.S.C. § 1. NPS was required to:

> promote and regulate the use of the Federal areas known as national parks, monuments, and reservations . . . as provided by law, by such means and measures as conform to the fundamental purpose of the said parks, monuments, and reservations, which purpose is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.

Id. Thus, national parks are created with a conservation mandate, i.e., to conserve and preserve the scenery, wildlife, and objects (natural and historical) within their boundaries for present and future enjoyment.

## B. National Environmental Policy Act (NEPA)

The National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321-4370 ("NEPA"), established a "national policy [to] encourage productive and enjoyable harmony between man and his environment," and was intended to reduce or eliminate environmental damage and to promote "the understanding of the ecological systems and natural resources important to" the United States. 42 U.S.C. § 4321. NEPA does not itself mandate particular results, but only imposes

"procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." <u>Dep't of Transp. v. Pub. Citizen</u>, 541 U.S. 752, 757-58 (2004); <u>see also</u> Citizens For Smart Growth v. Sec'y, Dept. of Transp., 669 F.3d 1203, 1211 (11th Cir. 2012); Sierra Club v. Van Antwerp, 526 F.3d 1353, 1360 (11th Cir. 2008). NEPA compliance must take place *before* decisions are made in order to ensure that those decisions take environmental consequences into account. Wilderness Watch v. Mainella, 375 F.3d 1085, 1096 (11th Cir. 2004)(emphasis in original).

### C. Executive Order 11,644

In response to a general increase of ORV use on public lands[4], in 1972 President Richard M. Nixon issued an executive order for the purpose of "establish[ing] policies and provid[ing] procedures that will ensure that the use of off-road vehicles on public lands will be controlled and directed so as to protect the resources of those lands, to promote the safety of all users of those lands, and to minimize conflicts among the various uses of those lands."

---

[4]As the Supreme Court would later state, "[t]he use of ORVs on federal land has negative environmental consequences, including soil disruption and compaction, harassment of animals, and annoyance of wilderness lovers." <u>Norton v. S. Utah Wilderness Alliance</u>, 542 U.S. 55, 60 (2004). Similarly, NPS has found that the use of ORVs in the Preserve adversely impacts water resources, soils, vegetation, and protected species. AR 65, 862, 878-79, 892-93.

Exec. Order No. 11,644, 37 Fed. Reg. 2877 (Feb. 8, 1972), as amended by Exec. Order No. 12,608, 52 Fed. Reg. 34617, Sec. 21 (September 9, 1987). This Executive Order, intended to further the purpose and policy of NEPA, required the Secretaries of the Departments of Interior, Defense, and Agriculture (and the Tennessee Valley Authority) to "develop and issue regulations and administrative instructions . . . to provide for administrative designation of the specific areas and trails on public lands on which the use of off-road vehicles may be permitted, and areas in which the use of off-road vehicles may not be permitted, . . ." Id. at §3. The Executive Order required that the regulations direct that the designation of such areas and trails: (1) "be based upon the protection of the resources of the public lands, promotion of the safety of all users of those lands, and minimization of conflicts among the various uses of those lands"; and (2) be located in such a way as to (a) "minimize damage to soil, watershed, vegetation, or other resources of the public lands"; (b) "minimize harassment of wildlife or significant disruption of wildlife habitats"; (c) "minimize conflicts between off-road vehicle use and other existing or proposed recreational uses of the same or neighboring public lands"; and (d) "ensure the compatibility of such uses with existing conditions in populated areas, taking into account noise and other factors." Id. at § 3(a). Further, such trails and areas were not to be located in

designated Wilderness or Primitive Areas, and "shall be located in areas of the National Park system . . . only if the respective agency head determines that off-road vehicle use in such locations will not adversely affect their natural, aesthetic, or scenic values." Id. Public participation in the promulgation of the regulations and designations of the areas and trails was required. Id. at § 3(b). The Executive Order also required the agencies to "monitor the effects" of ORV use on the public lands and "[o]n the basis of the information gathered, they shall from time to time amend or rescind designations of areas or other actions taken pursuant to this order as necessary to further the policy of this order." Id. § 8.

### D. Endangered Species Act (ESA)

Shortly after President Nixon issued this Executive Order, Congress enacted the Endangered Species Act of 1973, 16 U.S.C. § 1531-1544 (ESA), described as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." Tenn. Valley Auth. v. Hill, 437 U.S. 153, 180 (1978). The US Fish and Wildlife Service (FWS) is the agency responsible for implementing the ESA. The purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). "The plain intent of

Congress in enacting this statute was to halt and reverse the trend toward species extinction, whatever the cost." Tenn. Valley Auth., 437 U.S. at 184.

The "negative environmental consequences" of ORV use, S. Utah Wilderness Alliance, 542 U.S. at 60, potentially impacts endangered and threatened species of animals. Relevant provisions of the ESA will be discussed below.

### E.  Big Cypress Establishment Act

Against this background, in 1974 Congress established the Big Cypress National Preserve (Big Cypress NP or the Preserve) to "assure the preservation, conservation, and protection of the natural, scenic, hydrologic, floral and faunal, and recreational values of the Big Cypress watershed in the State of Florida and to provide for enhancement and enjoyment thereof." Pub. L. 93-440, § 1, 88 Stat. 1258 (Oct. 11, 1974), codified at 16 U.S.C. § 698f(a). The Secretary of the Interior (the Secretary) was authorized to acquire property within the Preserve, 16 U.S.C. § 698f(c)[5], and required to administer the Preserve as a unit of the National Park System "in a manner which will assure their natural and ecological integrity in perpetuity in accordance with the provisions of sections 698f to 698m-4 of this title and with the provisions of

_____

[5]The Secretary continues to acquire such property. This Court's files reflect that from October, 2002 to the present, the United States has filed almost 500 condemnation actions in the Fort Myers Division of the Middle District of Florida involving property in the Big Cypress NP/Addition.

sections 1, 2, 3, and 4 of this title, as amended and supplemented." 16 U.S.C. § 698i(a). The original Preserve was over 574,000 acres, (variously estimated at 574,440 acres, AR 58, or 582,000 acres, AR 858). Approximately 147,000 acres were added in 1988 by the Big Cypress National Preserve Addition (the Addition), PL 100-301; 74 Fed. Reg. 34030; 16 U.S.C. § 698m-1. AR 858.[6]

The Secretary was required to develop and publish "such rules and regulations as he deems necessary and appropriate to limit or control the use of Federal lands and waters with respect to: (1) motorized vehicles, . . . (6) hunting, fishing, and trapping, . . ." 16 U.S.C. § 698i(b). On the other hand, the Secretary was also required to "permit hunting, fishing and trapping on lands and waters under his jurisdiction within the Preserve and Addition in accordance with the applicable laws of the United States and the State of Florida, except that he may designate zones where and periods when no hunting, fishing, trapping or entry may be permitted for reasons of public safety, administration, floral and faunal protection and management, or public use and enjoyment." 16 U.S.C. § 698j. The legislative history of the Act made clear Congress' expectations that ORVs would be allowed in the Preserve, but restricted to designated trails:

---

[6]NPS began to administer the Addition in 1996, AR 858-59. Recreational ORV use has never been allowed on Addition lands. AR 850.

> Since the area to be included in the Preserve is largely undeveloped at the present time and because it will be managed in a manner which will assure its return to the true wilderness character which once prevailed, it will offer many outdoor recreation opportunities to the visiting public . . . . While the use of all terrain vehicles must be carefully regulated by the Secretary to protect the natural, wildlife, and wilderness values of the Preserve, the bill does not prohibit their use along designated roads and trails.

S. Rep. 93-1128 (Aug. 22, 1974), 1974 U.S.C.C.A.N. 5571; H.R. Rep. 93-502 at 5-6, 93rd Cong., 1st Sess. (Sept. 13, 1973).[7] Thus, since its creation the Preserve has required multiple use management, which the Supreme Court described as "a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put . . ." S. Utah Wilderness Alliance, 542 U.S. at 58.

### F. Executive Order 11,989

In 1977 President Jimmy Carter issued Executive Order No. 11989, which strengthened Executive Order 11,644. Exec. Order 11,989, 42 Fed. Reg. 26959 (May 24, 1977). Executive Order 11,989 provides that notwithstanding the general provisions relating to the zones of ORV use, the agency head "shall . . . immediately close" any area or route to ORVs whenever he determines that ORV use "will cause or is causing considerable adverse effects" to soil, vegetation, wildlife, wildlife habitat, or cultural or historic resources. Id. § 2 (amending Exec. Order 11,644, § 9(a)).

---

[7]NPS interprets this language to "authorize, but not mandate, the use of ORVs in the preserve, and to indicate the intent of Congress to restrict ORVs to designated roads and trails." AR 898.

The closure must remain in place until the adverse effects have been eliminated and measures have been implemented to prevent future recurrence.  Id. at §2(a).  Additionally, each agency head was authorized to "adopt the policy that portions of the public lands within his jurisdiction shall be closed to use by off-road vehicles except those areas or trails which are suitable and specifically designated as open to such use pursuant to Section 3 of this Order."  Id. at § 2(b).

**G.  NPS Special Regulations for the Big Cypress Preserve**

Shortly after creation of the Preserve, the Secretary began the process of drafting special rules relating to ORVs and other issues in light of some inconsistencies between the general NPS regulations and the Act creating the Preserve.  On January 24, 1979, the NPS published notice of a proposed special regulation for the Preserve, 44 Fed. Reg. 5680, and on August 1, 1979, NPS published the final rule promulgating 44 Fed. Reg. 45124.  This new regulation defined "motorized vehicles", closed certain areas and trails to ORV use, opened two specified areas to ORV use, provided for temporary closure of areas and routes by the superintendent, and imposed restrictions on ORV operation and equipment.  An Environmental Assessment (EA) was prepared in connection with the new regulation, but an Environmental Impact Statement (EIS) was not prepared because NPS found the regulations were not "a major Federal action significantly affecting the quality of the human

environment which would require preparation of an Environmental Impact Statement."[8]  44 Fed. Reg. 45128.  This was because "[t]he regulations will limit and control certain activities which heretofore have been unrestricted and, since they will phase out some adverse uses of the preserve lands, they have little potential for causing a significant environmental impact."[9]  Id.

## II.  Relevant Procedural History Regarding Big Cypress Preserve

### A.  The Big Cypress Preserve

The Preserve is located to the north and west of most of the Everglades[10] in southwest Florida.[11]  It is a mosaic of extensive prairies and marshes, forested swamps, and shallow sloughs on exceptionally flat terrain.  AR 59, 955.  The Preserve is an important watershed located upstream of Everglades National Park,

---

[8]An EIS as to the establishment of Big Cypress NP had been prepared in 1975.  40 Fed. Reg. 19223 (May 2, 1975).

[9]In April, 1981, NPS published a notice of intent to consider further rulemaking to regulate ORV use in the Preserve.  46 Fed. Reg. 22905-01 (April 22, 1981).  The NPS noted that the current regulations did not contain precise guidelines for the Preserve manager to use in determinating whether ORV use would cause significant environmental damage.  NPS sought public comment on whether standards were required to assure protection of the Preserve, and if so, the form the standards should take.  46 Fed. Reg. 22905-01.  The administrative record does not reflect that any action was taken pursuant to this notice.

[10]See Miccosukee Tribe of Indians of Fla. v. U.S. Army Corps of Eng'rs, 619 F.3d 1289, 1292-93 (11th Cir. 2010) for a description of the Everglades.

[11]See Attachment A to this Opinion and Order for the general location of the Preserve in South Florida.  AR 60.

and is an important and fragile area.  AR 59.  Due to soft soils and vegetation, the marshes and prairies are highly sensitive to ORV use, which can cause severe and irreparable damage to the Preserve's ecosystems.  AR 278-79, 960-67.

The Preserve is home to a variety of plant and animal life, including thirty animal species that receive special protection or are recognized by the State of Florida, the federal government, or international treaties.  AR 59, 966-68.  The Preserve and nearby public land provide approximately half of the habitat for the Florida Panther (*Felis concolor coryi*)[12], which was listed as an endangered species in 1967 and has remained on the Endangered Species List.  See 32 Fed. Reg. 4,001 (Mar. 11, 1967).  There are currently approximately 80-100 adult and immature Florida panthers within the Preserve boundaries.  AR 2049.

Since the 1930s, people have accessed what is now Preserve property using motorized ORVs, including swamp buggies, tracked vehicles, smaller all-terrain vehicles, and airboats.  AR 255. Historically, ORVs were allowed to go virtually anywhere, usually leaving visible tracks on the ground.  NPS has identified ORV use as the second most popular activity in the Preserve, AR 64, 265, and hunters, ORV users, and owners of improved properties within the Preserve as the primary Preserve visitors.  AR 250.

---

[12]See Fund for Animals, Inc. v. Rice, 85 F.3d 535, 538 (11th Cir. 1996) for a more complete description of the Florida Panther.

NPS divided the Preserve into six planning or management units: Bear Island, Deep Lake, Turner River, Corn Dance, Loop, and Stairsteps. See Attachment B to this Opinion and Order. AR 85. The Bear Island Unit (BIU) of the Preserve[13], located in its northwest corner, includes all of the Preserve lands north of Interstate 75, has one of the highest concentrations of important resources in the Preserve, is particularly rich in inland marshes and hardwood hammocks, and supports the healthiest remaining population of Florida panthers in the Preserve. AR 84, 100. The BIU is of great importance to panthers, having the highest proportion of preferred panther habitat within the original Preserve boundaries. AR 1107. Its location north of Interstate 75 provides additional prey resources and upland plant communities not available in the southern portion of the Preserve. AR 84; 1107-09. Much of the BIU is leased for cattle grazing. Active oil production has been taking place for many years, which has caused the development of an extensive network of roads providing access to existing oil production pads. AR 84. The BIU also contains the largest designated campground in the Preserve. AR 84.

**B. The 1991 General Management Plan**

In October, 1991, NPS issued a massive General Management Plan (1991 GMP) and Final Environmental Impact Statement (FEIS) for the

---

[13]See Attachment C to this Opinion and Order. AR 1677.

Preserve.  AR 38-755.  The GMP and FEIS addressed all aspects of management of the Preserve, including ORV management.

NPS reported that in the previous season it had issued 2,012 ORV permits.  At that time, ORVs could access the Preserve at almost any location and travel almost anywhere on trails crisscrossing much of the land.  AR 64.  Only the Loop Unit and two designated trails were closed to ORV use.[14]  Id.  NPS further reported that the network of ORV trails in the Preserve had developed haphazardly over the years, with many trails following active and abandoned mineral access roads, former logging trams, and major prairies and marshes.  AR 257.  NPS conservatively estimated the total mileage of ORV trails in the Preserve at 1,240 miles.  AR 257-58, 259; see Attachment D to this Opinion and Order for the NPS's visual display of the then-existing ORV trails in the Preserve.  AR 259.

The NPS "Proposed Action" in connection with ORV use, which with one exception[15] was the action ultimately adopted, provided in part that:

> Regulation and control of ORV use would be implemented through (1) a vehicle permit system, (2) general regulations governing the operation of vehicles, and (3)

_____

[14]The two trails closed to ORV use were the Eleven Mile Road and the Florida National Scenic Trail.

[15]Although a limit of 2,000 ORV permits was proposed in connection with the GMP/FEIS, NPS ultimately adopted a plan which allowed for 2,500 permits.  That number was later decreased back to 2,000 as part of the more detailed ORV Management Plan.

a system of designated access points, areas or trails for
each management unit with ORV use.  More detailed actions
concerning ORV management would be included in an ORV
management plan, which would be developed once the
[GMP/FEIS] has been approved.

AR 97.  The Proposed Action was said to result in a 20% reduction
in mileage of ORV trails, AR 302, limit the total number of ORV
permits to 2,000 per year, AR 99, and limit the number of access
points for ORVs to approximately 15 improved sites and 22
unimproved sites.  AR 98-100, 143.  Specific ORV trails and areas
were not identified, but would be designed through the
"Superintendent's Compendium" process authorized by 36 C.F.R. § 1.5
and 1.7.  AR 47.  The ORV restrictions were viewed as a method of
protecting the Florida panther by reducing human activity in its
habitat, AR 121, 312, and allowing for recovery of damaged natural
vegetation, AR 276, 281, and marshes, AR 278.

The Proposed Action also provided that ORV use in the BIU
would be limited solely to designated trails, with a network of 60-
80 miles of trails in order to "contain potential disturbance to
panthers, to control hunting pressure on panther prey (deer and
hogs), and protect important resource areas."  AR 100.  The
criteria applied to determine which trails and areas should be
closed to ORV use included causing extensive ponding or erosion;
adversely impacting soils, vegetation, wildlife, or wildlife
habitat; multiple trails cutting through sloughs, strands, or other

important resource areas; and threats of vandalism or erosion to cultural resource sites. AR 101.

In a January, 1992 Record of Decision (1992 ROD) intended "to document the National Park Service's determination of how Big Cypress National Preserve will be managed for the next 10 to 15 years," AR 12, NPS adopted the Proposed Action as part of its 1991 GMP. AR 10-19. The 1992 ROD stated that "[t]he preserve will be managed to conserve natural and cultural resources and ecological processes while accommodating uses and experiences that do not adversely affect the area's ecological integrity." AR 11.

**C. The 1995 Lawsuit**

The more detailed ORV management plan promised in the 1991 GMP was not forthcoming. In 1995, several environmental groups and individuals, led by the Florida Biodiversity Project and Brian Scherf, sued NPS and other federal agencies over ORV management in the Preserve. Fla. Biodiversity Project v. Kennedy, Case No. 95-50-Civ-FtM-24D (M.D. Fla.). The lawsuit asserted that NPS failed to circumscribe or manage ORVs in the Preserve in any meaningful way, resulting in an overall dispersed trail network of approximately 23,000 miles which severely damaged the Preserve. The lawsuit was settled by an October 25, 1995 Settlement Agreement (Doc. #39-2), in which NPS agreed to prepare the ORV management plan contemplated by the 1991 GMP and prepare a Supplemental Environmental Impact Statement (SEIS). The SEIS would analyze the

cumulative impacts of a "no action" alternative[16] to the extent required by NEPA, and would "build upon the analysis of issues and impacts previously set forth" in the 1991 GMP and FEIS. (Id. at 2-3). In January, 1996, NPS entered into an agreement with Virginia Polytechnic Institute and State University for preparation of the OVR plan. 61 Fed. Reg. 1599-02 (Jan. 22, 1996).

### D. Initial Work on ORV Plan

Between 1995 and March, 1999, the NPS collected data and public opinion for the development of the ORV plan for the Preserve. 64 Feg. Reg. 13233-01 (March 17, 1999). NPS described its efforts to collect data and information as including "meetings and interviews with groups, organizations and individuals from a variety of sectors including ORV and hunting groups, hiking clubs, environmental groups, employees or associates of the Miccosukee or Seminole Tribes, state agencies, and other federal agencies." Id. Efforts also included a mail-back ORV visitor-use survey, a Website and E-mail and two newsletters. Id. By March, 1999, NPS had entered the phase of the project in which alternatives for the management of ORVs in the Preserve would be developed and considered. Id. On August 16, 1999, NPS announced that the Off-Road Vehicle Management Plan/Supplement to the Final Environmental Impact Statement (ORVMP/SFEIS) was available for review by the

---

[16]The "no action" alternative basically meant that NPS would consider leaving everything as-is, i.e., leave the then-existing ORV trails in place.

public.  64 Feg. Reg. 44532-02 (Aug. 16, 1999); 64 Fed. Reg. 62218-01 (Nov. 16, 1999).

In preparing the ORV management plan, NPS recognized that its strategy up until that point allowed dispersed use of ORVs in some areas of the Preserve, restricted use of ORVs to designated trails in other areas, and closed other areas completely to ORV use.  AR 851, 861.  Generally, ORV users had unlimited access to the Preserve from approximately 70 informal locations.  AR 861.  The Deep Lake and Loop units were closed to all ORV use.  Dispersed use was allowed in the Corn Dance and Turner River units.  AR 941.  The Stairsteps Unit was managed in four zones with varying ORV use allowed.  AR 851, 861, 941.  In the BIU, ORV use was allowed on approximately 54-55 miles of designated trails, 16 miles of which were above-grade roads constructed prior to the establishment of the Preserve for agriculture, logging, and mineral exploration.  AR 861, 941, 943.  There were no limitations on the types of vehicles permitted within the management units.  AR 862.  NPS characterized this management strategy as "primarily reactive to unacceptable conditions", AR 862, with ad-hoc monitoring of ORV impacts mainly through staff observations.  AR 862.  NPS concluded that this management strategy did not meet its legal mandates nor comply with its policy.  AR 862, 889-90.

## E. FWS Biological Opinion

NPS formally consulted with FWS regarding ORV use and its potential effect on the endangered Florida panther, as required by the ESA. On July 14, 2000, the FWS issued its 2000 Biological Opinion for the draft 2000 ORV Management Plan. AR 1080-1126. FWS concluded that implementation of the plan may cause an "incidental take" of the panther in the form of harassment, AR 1116, but "is not likely to jeopardize the Florida panther." AR 1115, 1117. FWS attached an Incidental Take Statement (ITS) to its opinion, which required NPS to comply with the following six non-discretionary terms and conditions:

> (1) reducing the extent of trails in Bear Island and employing designated trails in the rest of the Preserve,
>
> (2) studying the level of ORV use in Bear Island to determine the level that is acceptable and compatible with panther use,
>
> (3) continue panther monitoring and initiate a study concurrent with the ORV carrying capacity and level of use study,
>
> (4) provide FWS with copies of studies performed on panther use and related ORV investigations,
>
> (5) implement specific studies of the effects of the action on Preserve panthers and determine the ORV carrying capacity for management units within the Preserve, and
>
> (6) notify FWS upon locating dead, injured or sick panthers. AR 1117-18.

**F.  2000 ORV Management Plan**

In August, 2000, NPS announced the availability of the Recreational Off-Road Vehicle Management Plan/Supplement to the Final Environmental Impact Statement (RORVMP/SFEIS).  65 Fed. Reg. 49593-01 (Aug. 14, 2000).

On September 28, 2000, NPS issued a Record of Decision, AR 849-54, adopting the final version of the 2000 ORV Management Plan. This was a 200-plus page document which included an SEIS related specifically to ORV impact on the Preserve.  AR 849-54.  The plan applied only to the original Preserve, AR 859, and did not address commercial operations of ORVs or ORV use in the Addition.  AR 880. Based upon legislative mandates and special commitments, NPS stated that "ORV use can occur only to the extent that it does not significantly adversely affect the preserve and its natural and cultural resources.  Appropriate use of ORVs within this context, and the means for achieving that use, are provided in this plan." AR 881.  Due to its "scope and complexity", AR 880, NPS contemplated a three-phase implementation process with all aspects of the plan being implemented within ten years.  AR 861, 880, 932, 936-40.

Under the 2000 ORV Management Plan, NPS would apply a "precautionary principle, which would favor resource protection over resource use" in its management of motorized recreational ORVs.  AR 859-60, 896, 898.  The plan "emphasizes protection of

natural and cultural resources in a manner that would leave the resources unimpaired for future users, while allowing ORV access for resource-related recreational opportunities." AR 896. Because NPS recognized its database of information was incomplete, "[w]here the effects of an action are unknown, the proposed management actions would favor the protection of the preserve's natural and cultural resources." AR 860.

NPS would also use an "adaptive management approach" which included continual review and modification of the plan as needed to ensure effectiveness and compliance with mandates and policies, AR 880, and "adaptive management techniques" which would "apply lessons learned from research and field experience to improving ORV management . . ." AR 896. "This means that the plan would not be a static document but instead would evolve as additional information became available. Sources of information would include existing data, new information from scientific research and monitoring, and input from NPS staff and other individuals who are familiar with the preserve." AR 897. Management actions would be adapted that "assure the highest protection of the preserve's resources." AR 861. Any modifications to the plan would comply with all appropriate laws and regulations, including but not limited to, the NEPA and the ESA. AR 800, 880. Modifications to the plan would also include appropriate public involvement. Id.

In relevant part, under the 2000 ORV Management Plan NPS would:

-eliminate dispersed use of ORVs, restricting access to the Preserve to specified access points and restricting ORV use to designated trails, AR 860, 898;

-limit ORV use throughout the Preserve to no more than 400 miles of designated primary trails and 15 designated access points, AR 898, 902-04;

-perform a "detailed analysis using such tools as geographic information system, staff knowledge, and ground truthing" in order to determine the "most appropriate route for each trail," AR 898;

-continue to develop a designated trail system and access points based on "resource protection" and "visitor experience" criteria, AR 899;

-include the following principles as "resource protection criteria": (1) avoid or minimize trails through vegetation communities most susceptible to impacts, (2) avoid or minimize trails in areas where ORVs may have a detrimental effect on threatened and endangered species; (3) avoid archeological and sacred sites; (4) designate trails and access points in areas that offer the most suitable substrate; and (5) locate access points and designate trails to maximize use of existing disturbed areas, AR 899-900;

-include the following principles as "visitor experience criteria": (1) designate trails to provide access, (2) avoid or minimize user conflicts, and (3) avoid or minimize safety hazards, AR 900-01;

-conduct a computerized geographic information system suitability analysis (GIS) using the above criteria to refine the current conceptual configuration of the ORV network shown on a map entitled "Conceptual Framework of Access Points and Primary Trails" to select optimal alignments for each component of the access points and trails, AR 901-03;

-use primary trails, i.e., trails emanating from the designated access points and providing recreational

access within the Preserve, as the principal ORV routes, AR 903;

-use short secondary trails as access to private property or specific destinations such as campsites, AR 903;

-develop a system of indicators and standards to assess trail conditions and to support the need for management action, AR 908-10;

-monitor the effects of ORV use, AR 908-11;

-implement management actions, including trail closures, relocations, maintenance, and changes to level or type of use, based on the monitoring results, AR 912-17;

-implement a permit program which required a user to possess certain permits before using an ORV in the Preserve, and to issue only 2,000 ORV permits per year, AR 917-22;

-plan for and begin restoration of areas impacted by ORV use to a more desirable condition, and monitor recovery activities, AR 926-41; and

-"establish an advisory committee of concerned citizens to examine issues and make recommendations regarding the management of ORVs in the preserve," AR 898.

As to the BIU specifically, the 2000 ORV Management Plan provided that NPS would:

-allow the use of swamp buggies, all-terrain cycles, and street-legal, four-wheel-drive vehicles, AR 903; and

-allow for "approximately 30 miles"[17] of designated primary trails, AR 903, accessed through a single access point near the existing Bear Island Campground, 904-05.

---

[17]Although the 2000 ORV Management Plan provided for approximately 30 miles of trails in the BIU, it also stated: "[t]hese lengths could change as better data become available." AR 903.

## G.  2000 Trail Closings

By a letter dated October 16, 2000, effective October 24, 2000, NPS Superintendent John Donahue (Superintendent Donahue) notified ORV users of changes due to the implementation of the 2000 ORV Management Plan.  AR 1178-81.  These included that all ORV users would depart from and return to designated access points as located on NPS maps.  AR1178-81.  ORV use was prohibited between 10 p.m. and 5 a.m.  Id.  As to the BIU, ORV use was limited to certain types of vehicles, access was limited to one access point, and ORV use was restricted to designated trails.  These trails were previously known as the Green, Red, Yellow, and Blue trails, and were later renamed.  See Attachment E to this Opinion and Order. AR 6489.  The 2000 ORV Management Plan closed the "Green Trail", "Blue Trail," "Yellow Trail" and part of the "Red Trail".  Id.  As a result of these trail closings, the approximately 55 miles of designated trails in the BIU were reduced to about 23 miles of designated primary trails and 0.34 miles of secondary trail.  AR 1752.  The resulting ORV trails in the Bear Island Unit were depicted in the NPS "Interim ORV Map, October 24, 2000."  See Attachment F to this Opinion and Order.  AR 1176.

NPS stated that the intent of the plan was "to limit and control the use of off-road vehicles (ORV) use in a manner that will ensure the natural and ecological integrity of the preserve. The selected action will result in long-term benefits to

vegetation, soils, surface water flows, and water quality. Further, the selection action may benefit the Cap Sable seaside sparrow and the Florida Panther." 65 Fed. Reg. 70934-03 (Nov. 28, 2000).

**H.   2001 Challenge to Plan and Trail Closures**

In 2001, persons and groups affiliated with ORV interests filed a lawsuit in this Court challenging the 2000 ORV Management Plan and NPS's decision to close the trails listed above. Wildlife Conservation Fund of Am. v. Norton, Case No. 2:01-cv-25-FtM-29DNF (arguing that "[t]he new anti-access edicts in Big Cypress reflect one Administrations's political agenda and disregard of on-the-ground facts and the law related to the Preserve." (Case No. 2:01-cv-25, Doc. #1, ¶1)). On February 22, 2005, the undersigned issued an Opinion and Order finding that NPS had taken the required "hard look" at its options and the 2000 ORV Management Plan was not arbitrary or capricious, was not an abuse of discretion, and was not otherwise contrary to law. (Docs. #95-4, 95-5.)

**I.  2007 Decision to Reopen BIU Trails**

In January, 2006, a group of persons formed the Big Cypress Sportsmen's Alliance (the Sportsmen's Alliance) to advocate greater ORV access to the Preserve, particularly in the BIU. AR 1203-04. In February, 2006, new Superintendent Karen Gustin (Superintendent Gustin) queried her staff as to the rationale for the trail closures in the BIU. AR 1205-09. During this period, NPS formed

an advisory ORV Committee to address ORV issues in the Preserve[18], and began considering whether to modify the ORV trail system within the BIU in order to provide for greater access for ORV users.[19]  AR 1210-11, 1214-15.

On May 4, 2006, the Sportsmen's Alliance made a handwritten request to reopen ORV trails in certain portions of the BIU.  AR 1213.  Although the request included a rough map, AR 1212, it did not specify the number of miles the Sportsmen's Alliance wanted reopened.  An NPS email later clarified that the request related to reopening the Yellow and Blue trails, which had been closed in October, 2000 pursuant to the adoption of the 2000 ORV Management Plan.  AR 1271.

On May 12, 2006, Superintendent Gustin asked her staff to prepare a recommendation regarding the development of an additional 10 to 14 miles of trails in the BIU, AR 1216, and assigned three staff members to the project.  AR 1216-19, 1230.  Subsequent correspondence between NPS, environmental interests and ORV interests outlined the subsequent events leading up to the 2007 decision.

---

[18]It appears that the ORV Committee to be established pursuant to the 2000 ORV Plan was not formally established until August 1, 2007, 72 Fed. Reg. 42108-02 (Aug. 1, 2007), after the February, 2007 reopening of the BIU ORV trails.  Its "first meeting" was on November 29, 2007.  72 Feg. Reg. 62492-02 (Nov. 5, 2007).

[19]NPS also began considering modifying the ORV trail system in Zone 4 of the Stairsteps unit.

On May 22, 2006, NPS informed the Sportsmen's Alliance that 21 miles of trails had been marked in the BIU.[20]  NPS stated that the 2000 ORV Management Plan allowed development of 30 miles of ORV trails in the BIU, and mistakenly stated that if NPS stuck to the 30 miles it would not have to do any additional environmental compliance.  AR 1230.

In June, 2006, NPS employees and seven or eight other persons surveyed the Yellow Trail, Red Trail and Blue Trail as part of the "ground truthing" for the project.[21]  The ORV Committee began working to define the term "adaptive management," which until then had lacked a concrete meaning.  AR 1231, 1246-47. The ORV Committee also began working to create a standardized process to address future ORV trail change requests.[22]  AR 1231, 1248-50, 1260-65, 1284-89.

An NPS email at the end of June, 2006, assured the Sierra Club that NPS was gathering information about the Sportsmen's Alliance request, but that no decisions, promises or commitments had been

_____

[20]In fact 24.14 miles of trails had been designated for ORV use at that time.

[21]"Ground truthing" refers to site-specific physical surveys of the trails.  Or. Natural Res. Council Fund v. Brong, No. Civ. 04-693, 2004 WL 2554575, at *16 (D. Or. 2004).

[22]NPS ultimately prepared draft guidelines for addressing ORV trail change requests, but the record does not indicate that these guidelines were applied to the 2007 decision.  AR 1301-04, 1314.

made.  AR 1271.  The email continued that the "protection of the resource is our prime concern.  If any additional trail routes are designated, they would have to be on preexisting trails and sustainable.  We would not be designating trails in undisturbed wetlands or through areas that could not sustain use."  AR 1271-72.

In a July 10, 2006 email, an NPS employee stated that if NPS decided to designate any new trails, including secondary trails, it would prepare an Environmental Assessment, which would involve public and agency comment.  AR 1297.  As discussed below, no Environmental Assessment was ever prepared by NPS regarding the 2007 re-opening of BIU ORV trails.

In a July 13, 2006 Memorandum, NPS's Resource Management Chief discussed FWS's 2000 Biological Opinion and noted FWS's concern that ORV use would increase human presence in the Preserve and result in increased disturbance of the panther population.  The Resource Management Chief also noted that the 2000 ORV Management Plan contemplated that 31 separate projects would be undertaken to discover any impacts resulting from management actions and ORV use, but none of these projects were completed.  (Doc. #61-5, Exh. 4).

On July 28, 2006, Superintendent Gustin adopted the ORV Committee's recommendation for additional public involvement.  AR 1315-16.  She authored a letter stating NPS was "moving forward" with the implementation of the 2000 ORV Management Plan, soliciting public input regarding additional trail access, and announcing a

public "scoping"[23] meeting which would take place on August 15, 2006. AR 1325-29. Members of the public were invited to identify destinations for ORV trails and explain why such trails would be consistent with the 2000 ORV Management Plan. Id. Invitations were sent to a diverse group of approximately 2,000 individuals and organizations, including plaintiffs. AR 1668.

In a July 31, 2006 email, NPS Preserve Management Chief Ron Clark noted that the requests to modify the existing trails were made under the assumption that adaptive management and the precautionary principle set forth in the 2000 ORV Management Plan allowed NPS to do so. Mr. Clark stated that the new information NPS had that it did not have in 2000 was "that the panther numbers in the Preserve are on the rise, panther/human incidents are on the rise, panther habitat in Florida has decreased, and Bear Island, because of its topography and vegetation cover, may be more important to panthers now than at any time since the Preserve's creation." AR 1481-82.

The August 15, 2006, scoping meeting was well-attended. AR 1366-1374. NPS received a wide range of verbal and written comments from the interested public. On one end of the spectrum, there were requests to reopen all 55 miles of primary trails

_____

[23]"Scoping" is "an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action." 40 C.F.R. § 1501.7. See Wyoming v. U.S. Dep't of Agric., 661 F.3d 1209, 1237-38 (10th Cir. 2011).

existing in the BIU prior to the adoption of the 2000 ORV
Management Plan and to open additional access points or specific
trails. E.g., AR 1354-1462. Others, including some of the
plaintiffs, made detailed responses strongly opposing any change to
the existing trail designations and challenging the adequacy of
NPS's 2000 ORV Management Plan implementation process. AR 1389-98.
NPS viewed this meeting as only the first step in the process, "to
be followed by future ground truthing before decisions are made."
AR 1346.

After the scoping meeting, NPS attempted to identify the
source of funds for needed research projects. AR 1468-73, 1493-
1507. NPS prepared various technical assistance requests for ORV-
related research for fiscal year 2007. AR 1531-45. None of the
research projects were completed prior to the decision at issue in
this case.[24]

In a September 8, 2006, email, Superintendent Gustin stated
that NPS collected "a lot of input and data" at the August 15, 2006
meeting, but "there is a review process that needs to occur before
we open any additional trails anywhere." AR 1412-13. The email
continued that NPS would make all the necessary considerations
under NEPA and the 2000 ORV Management Plan, and summarized the
process: "Basically, once we gather information on trails and do

_____

[24]It appears that NPS and FWS later obtained funding for ORV-
related research in 2008. AR 6840-6844.

some preliminary ground truthing, we solicit public input, and then enter an internal review process from which results are forwarded to the superintendent's office."   AR 1413.   In an apparent reference to the August 15 public meeting, the email continued, "We have solicited public input for Bear Island and Zone 4 and are now collating that data with the intent of beginning our internal review."   Id.   "We then consider the proposed concept and in consultation with environmental compliance staff, make a determination as to what level of compliance is required before implementing the concept."   Id.  Superintendent Gustin described the process as "very labor intensive."   Id.

In a September 15, 2006 email, Superintendent Gustin provided a progress report on Bear Island.   She explained that there is a review process which needed to occur before any additional trails are opened anywhere, which included "going through and making all of the considerations we are responsible for making under NEPA and the ORV management plan itself."   Id.  AR 1508-09.

In October, November, and December, 2006, NPS produced a number of different maps depicting various proposed trail expansions for the BIU.  These maps showed 24.14 miles of existing trails, and included at least five different proposals for expansion of primary and secondary trails in varying lengths.  AR 1571-77, 1610-12, 1615.

A December 4, 2006, letter from Superintendent Gustin provided another update of the BIU project. She explained the process of review and the functions to be performed by NPS staff, and stated NPS expected to reach a decision on the BIU within a month or two, pending natural resource and archeological surveys.[25] AR 1613-14. The Florida Biodiversity Project responded with a December 21, 2006 letter objecting to the NPS actions and raising several issues as to the BIU. AR 1619-21.

In late December, 2006, NPS stated that the trail designation criteria from the 2000 ORV Management Plan was being followed, and that NPS had not yet finished field checking possible routes for sustainability. AR 1668. NPS asserted that the public input from the preparation of the 2000 ORV Management Plan satisfied the public input requirements, and that the August 15, 2006 scoping meeting and questionnaire provided NPS with enough information to proceed with the plan implementation. AR 1668-69.

January and February, 2007 saw the continued preparation of more draft ORV trail maps for the BIU. AR 1686-95, 1699, 1719,

---

[25]An archeological survey was conducted in January 2007 by the Southeast Archeological Center. AR 1784-1788. The survey found that the majority of trails NPS proposed to designate in the BIU were in "open pine and palmetto thicket, marsh, and open prairies, or savannah." Previous surveys indicated that archeological sites are most likely located on hardwood hammocks. Thus, the surveyor concluded that the proposed trails were unlikely to contain archeological sites. Because the survey was done "on short notice and conducted in a relatively short amount of time," more intensive archeological investigation was suggested in the future. AR 1787.

1749.   In early January, 2007, NPS conducted a survey which recorded the conditions of the natural resources in an area near Bear Island that may be considered for additional ORV use.   AR 1700-13.   The survey found no issues with the biological communities or the threatened or endangered community components, but could only state that the substrates "may be suitable for ORV use."   AR 1701, 1704.

The NPS proposed changes to the designated trails in the BIU were ultimately depicted in a February 13, 2007 ORV trail map.   AR 1697-98, 1749-50.   <u>See</u> Attachment G to this Opinion and Order.   An additional map depicted the type of vegetation through which the trails ran.   AR 1696.   <u>See</u> Attachment H to this Opinion and Order. According to the map, 34% of the primary trails and 28% of the secondary trails would be located in prairies and marshes.[26]

On February 15, 2007, just six days prior to announcing NPS's 2007 decision to reopen the BIU trails, Superintendent Gustin wrote a letter to FWS Field Supervisor Paul Souza.   In the letter, Superintendent Gustin noted that under the 2000 ORV Management Plan NPS was "instructed to manage the development of up to 400 miles of primary trails, create secondary trails, and establish a designated trail system," and that NPS was "currently working on finishing the

---

[26]The 2000 ORV Plan identified marl prairies as "the vegetation community most sensitive to disturbance by ORVs."   AR 899.   The plan also quoted research available in 2000 which stated that "[r]utting from ORVs in marshes is easily visible on aerial photography, and in many areas is quite extensive."   AR 963.

trail system in the Bear Island management unit." AR 1752.
Superintendent Gustin stated NPS was working on adding
approximately 11 miles of primary trails in the BIU to the then-
current 23 miles, and adding approximately 7 miles of secondary
trails to the 0.34 miles. Id. She also stated that the BIU was
"very popular with hunters" and "is very good habitat for the
Florida panther." AR 1753. She then described a series of four
actions that NPS committed to undertake to implement the terms and
conditions of the July 14, 2000 Biological Opinion, including the
initiation of a carrying capacity study for the BIU, development of
a scope of work (SOW) on evaluating the impacts of ORV use on
panther movement, collection and analysis of use data, and periodic
review of habitat conditions adjacent to trials through a habitat
checklist and photo monitoring points. AR 1753. Superintendent
Gustin requested Mr. Souza's concurrence that the 2007 proposed
trail designations at the BIU were consistent with the terms and
conditions of the 2000 Biological Opinion. AR 1753-54, 1758.

The next day, on February 16, 2007, Field Supervisor Souza
wrote Superintendent Gustin confirming that the commitments
outlined in NPS's letter were sufficient to demonstrate NPS's
intention to implement the ITS and the terms and conditions of the
2000 Biological Opinion with respect to the BIU. AR 1758-61.

On February 21, 2007, NPS issued a press release and closure
order announcing the modification of the designated trail system

and completion of the implementation of the 2000 ORV Management Plan within the BIU, effective February 28, 2007.  AR 1766-73. NPS's designation of ORV trails in the BIU provided for: (1) reclaiming 3.11 miles of primary trail to be returned to a natural condition; (2) converting 1.58 miles of primary trail to secondary trail; (3) reopening 15.21 miles of previously closed trails as primary trails; and (4) reopening 7.49 miles of previously closed trails as secondary trails.  This resulted in a designated trail system for the BIU consisting of a total of 34.95 miles of primary trail and 9.41 miles of secondary trail.  AR 1766.  NPS also proposed additional studies to be performed in the future and committed to undertake a periodic review of habitat conditions adjacent to the BIU trails.  AR 2130, 1571-2, 1696, 1685.

On September 19, 2007, FWS issued its 2007 Amended Opinion. AR 2043-2095.  In the Amended Opinion, FWS concluded that the new ORV trail designations would likely have a "minor" effect on panthers in light of the fact that "[p]anther locations during the hunting season in Bear Island were on average, only 180 meters (m) farther from trails than before the hunting season.  An increase of 180 m probably has minor biological consequences."  In reaching this conclusion, FWS relied on the same study it relied upon in 2000 – the Janis and Clark study conducted in 1999.  The 2007 Amended Opinion also amended the six "non-discretionary" terms and conditions outlined in the 2000 opinion/ITS.  AR 2073.

## III. Discussion of Counts of Complaint

The Court will discuss Count One, breach of the Settlement Agreement, and Count Two, violation of NEPA, in tandem.

### A.  Count One:  Breach of Settlement Agreement

Count One alleges that the February, 2007 decision of NPS to reopen ORV trails in the BIU violated the 1995 Settlement Agreement.  Both sides agree that this is a breach of contract claim.  (Doc. #95, p. 16; Doc. #103, p. 39).  See In re Chira, 567 F.3d 1307, 1311 (11th Cir. 2009)("Principles governing general contract law apply to interpret settlement agreements."); R.A.M., LLC v. Hill, 393 F. App'x 684, 686 (11th Cir. 2010)("A settlement agreement is a contract"); Greco v. Dep't of the Army, 852 F.2d 558, 560 (Fed. Cir. 1988)(same).

It appears that the Settlement Agreement is governed by Florida law.  Mobil Oil Exploration & Producing Se., Inc. v. United States, 530 U.S. 604, 607-08 (2000)("When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." (citation omitted); R.A.M., LLC, 393 F. App'x at 686 ("Settlement agreements are interpreted under the law of the forum state")(citing Schwartz v. Fla. Bd. of Regents, 807 F.2d 901, 905 (11th Cir. 1987)); F.T.C. v. Am. Entm't Distribs., Inc., 433 F. App'x 816, 817 (11th Cir. 2011)(whether settlement agreement with government agency was valid contract is determined by reference to

state substantive law). Defendants, however, rely on federal common law contract principles. (Doc. #103, p.42). As discussed below, the Court discerns no material differences between Florida law and federal common law in this case.

The elements of a breach of contract claim are the existence of a valid contract, a material breach of that contract, and resulting damages. State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Ctr., Inc., 427 F. App'x 714, 725 (11th Cir. 2011); Schiffman v. Schiffman, 47 So. 3d 925, 926 (Fla. 3rd DCA 2010); AVVA-BC, LLC v. Amiel, 25 So. 3d 7, 12 n.3 (Fla. 3d DCA 2009). At oral argument, defendants' counsel cited essentially the same elements for breach of contract under federal common law. (Doc. #118, p.57.)

**(1) Existence of Contract:**

It is undisputed that a contract exists in the form of the 1995 Settlement Agreement, and that plaintiffs the Florida Biodiversity Project and Brian Scherf were signatories to that agreement. These two plaintiffs clearly have standing to enforce its provisions.[27] Rumsfeld v. Forum for Academic & Inst. Rights, Inc., 547 U.S. 47, 52 n.2 (2006).

---

[27]The Court need not further address defendants' suggestion that other plaintiffs lack standing to enforce the Settlement Agreement. (Doc. #103, p. 39, n.41.) The presence of two plaintiffs with standing is sufficient to satisfy the Article III case-or-controversy requirement.

**(2)  Interpretation of Settlement Agreement:**

Two issues are raised relating to the interpretation of the Settlement Agreement: (a) whether NPS's interpretation of the terms of the agreement is entitled to <u>Chevron</u>[28] deference and (b) whether Florida law or federal common law applies to the agreement.

**(a)  Deference to NPS Interpretation?**

Defendants ask the Court to give deference to NPS's interpretation of the Settlement Agreement.  Specifically, defendants request application of the arbitrary and capricious standard when NPS interprets contract terms which include statutory and regulatory language, but not where the contract uses "ordinary contract terms."  (Doc. #103, pp. 39-40).

Although an agency's interpretation of a contract is generally <u>not</u> entitled to deference, some circuits have given deference under certain circumstances.  The Tenth Circuit adopted the view that under <u>Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837 (1984), an agency's interpretation of a contract is reviewed under the arbitrary and capricious standard when (1) the agency routinely reviews such contracts, (2) review of such contracts is a duty delegated to the agency by Congress, and (3) the contract deals with an arcane subject matter or uses specialized terminology with which the agency is familiar.  <u>Weight</u>

---

[28]<u>Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837 (1984)

Loss Healthcare Ctrs. of Am., Inc. v. Office of Pers. Mgmt., 655
F.3d 1202, 1205-06 (10th Cir. 2011)(citing Sternberg v. Sec'y,
Dep't of Health & Human Servs., 299 F.3d 1201, 1205 (10th Cir.
2002)).

In Muratore v. U.S. Office of Pers. Mgmt., 222 F.3d 918,
921-23 (11th Cir. 2000), the Eleventh Circuit found that under the
facts of that case the agency's interpretation of the contract was
entitled to deference.  According to the Muratore court, Chevron
suggests that "the institutional advantages of agencies apply to a
broad range of administrative activities," and contract
interpretation is sufficiently similar to statutory interpretation
to warrant deference.  The Eleventh Circuit found the agency had
relevant expertise in the area because it negotiated the contracts
at issue, routinely interpreted plans, had been given broad
authority by Congress to regulate the field in which it negotiated
the contracts, and had the ability to take a broad, national view
when it interpreted plans, which served the function of ensuring
consistent, nationwide application.  Id. at 923.  The Eleventh
Circuit concluded that this expertise "justifies deference in
[that] case."  Id.

The Supreme Court thereafter held that Chevron deference
should be given only to those agency interpretations found in an
"administrative action with the effect of law."  United States v.
Mead Corp., 533 U.S. 218, 230 (2001).  Following the Supreme

Court's decision in <u>Mead Corp.</u>, the Eleventh Circuit held that settlement agreements are "far removed" from the type of administrative action entitled to <u>Chevron</u> deference. <u>Ala. Power Co. v. U.S. Dep't of Energy</u>, 307 F.3d 1300, 1312 (2002).

Here, NPS has neither identified sufficient facts which give it special expertise in the interpretation of settlement agreements involving ORV use in a national park or preserve, nor shown that its interpretation of the Settlement Agreement is an administrative action with the effect of law. Under either line of authority discussed above, the argument that deference must be given to NPS's interpretation of the Settlement Agreement is not supported. Therefore, the Court will apply the normal rules of contract interpretation to the construction of the Settlement Agreement.

### (b) Florida or Federal Law?

Defendants assert that federal common law applies to the interpretation of the Settlement Agreement. (Doc. #103, p. 41.) As suggested above, the Court finds no significant distinctions between the principles cited by defendants and the ordinary principles of contract construction under Florida law.

A contract is ambiguous if a word or phrase in a contract is subject to more than one reasonable meaning; courts decide as a matter of law whether ambiguity exists in a contract. <u>Southern-Owners Ins. Co. v. Hayden</u>, 413 F. App'x 187, 188 (11th Cir. 2011)(applying Florida law). "Under Florida law, the basic rule of

contract interpretation is that the intention of the parties is to be determined from a consideration of the whole agreement." In re Chira, 567 F.3d at 1311 (internal quotation marks and citation omitted.) "Under Florida law, it is well settled that the actual language used in the contract is the best evidence of the intent of the parties and, thus, the plain meaning of that language controls." Hayden, 413 F. App'x at 188. "In interpreting a contract under Florida law, we give effect to the plain language of contracts when that language is clear and unambiguous. We must read the contract to give meaning to each and every word it contains, and we avoid treating a word as redundant or mere surplusage if any meaning, reasonable and consistent with other parts, can be given to it." Equity Lifestyle Props., Inc. v. Fla. Mowing & Landscape Serv., Inc., 556 F.3d 1232, 1242 (11th Cir. 2009)(internal quotation marks, footnote, and citations omitted).

When applying federal common law to contract cases, courts generally look to the Restatement (Second) of Contracts for guidance. Mobil Oil Exploration, 520 U.S. at 608; U.S. ex rel. Ubl v. IIF Data Solutions, 650 F.3d 445, 451 (4th Cir. 2011). The relevant federal common law contract principles are the same as the Florida principles.

> The paramount goal of contract interpretation is to determine the intent of the parties. Courts are to consider not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior.

The strongest objective manifestation of intent is the language of the contract. Thus, where the words of the contract clearly manifest the parties' intent, a court need not resort to extrinsic aids or evidence.

The words of the contract clearly manifest the parties' intent if they are capable of only one objectively reasonable interpretation. If the words of the contract are capable of more than one objectively reasonable interpretation, the words are ambiguous. Ambiguous terms that appear clear and unambiguous on their face, but whose meaning is made uncertain due to facts beyond the four corners of the contract, suffer from latent ambiguity.

Courts have the responsibility to determine as a matter of law whether contract terms are clear or ambiguous. To make that determination, a court must consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning. The objective, extrinsic evidence proffered may include, for example, the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning. Extrinsic evidence notwithstanding, the parties remain bound by the appropriate objective definition of the words they use to express their intent.

Baldwin v. Univ. of Pittsburgh Med. Ctr., 636 F.3d 69, 75-76 (3rd Cir. 2011)(citations and internal punctuation omitted). Both sides agreed at oral argument that the choice of law is immaterial to the outcome of this case. (Doc. #118, p. 59.)

**(3) Obligations Under the Settlement Agreement:**

To determine whether a contract was breached, the Court must first determine the obligations under the contract. In the Settlement Agreement, NPS agreed to develop the ORV Management Plan and issue an SEIS analyzing the cumulative environmental effects of implementing such a plan. The parties agreed that the "overall

-42-

objective of the ORV Management Plan will be to establish a
comprehensive system for management of ORV use in [the Big Cypress
NP] with the goal of assuring the natural and ecological integrity
of [Big Cypress NP] resources in accordance with the [Big Cypress
NP] Establishment Act."  (Doc. #39-2, p. 3).  Paragraph 6 of the
Settlement Agreement provided that the ORV Plan would "be reviewed
on a continuing basis" and that:

> [s]upplemental environmental analyses of the ORV Plan
> will be prepared in the future if the NPS makes
> substantial changes in the proposed action that are
> relevant to environmental concerns, or if the NPS
> determines that significant new circumstances or
> information exist relevant to environmental concerns and
> bearing on the proposed action or its impacts.  The
> public will be allowed to participate in such
> supplemental analyses to the full extent required by
> NEPA, the CEQ regulations and the NPS regulations.  If
> interested parties submit written comments raising issues
> which may be considered substantial changes in the Plan
> or significant new circumstances or information, NPS will
> make its best efforts to respond to such comments within
> a reasonable amount of time.  (AR 798-799.)

(Id. at pp. 6-7, ¶6.)  Additionally, "[n]othing in this Settlement
Agreement shall be construed to limit or modify the right of
plaintiffs to challenge final agency action taken by NPS in
connection with the final ORV Management Plan to the extent
permitted by law."  (Id.)

The agreement also provided, however, that "[n]othing in this
Settlement Agreement shall be construed to limit or modify the
discretion accorded to the federal defendants by the statutes they
administer or by general principles of administrative law."  (Id.

at p. 11, ¶16.)  The Settlement Agreement did not limit the discretion of NPS to allocate funds among priorities within the national park system.  (Id. at p. 12, ¶ 17.)  Although defendants were required to "make all reasonable efforts to obtain the resources necessary to carry out the terms of the agreement and to have those funds allocated to" the Preserve, they were not required to obligate or pay funds or in any way violate the Anti-Deficiency Act (31 U.S.C. § 1341) or any other applicable appropriations law. (Id.)  The Settlement Agreement "embodie[d] the entire terms and conditions of the agreement between the parties."  (Id. at p. 11, ¶15)

Defendants argue that paragraph 6 of the Settlement Agreement merely requires NPS to comply with NEPA and its regulations, nothing more.  This is so, defendants argue, because paragraph 6 mirrors language directly from a Council on Environmental Quality (CEQ)[29] regulation which governs the agency's obligation to supplement an EIS.  40 C.F.R. § 1502.9(c)(1);(Doc. #103, pp. 39-42.)  The choice of this language, defendant's argue, demonstrates the parties' intent to render NPS's contractual supplementation obligation coextensive with its obligation under NEPA.  (Id. at p. 42.)  Defendants further argue that this intent is buttressed by

_____

[29]Congress established the CEQ to oversee the implementation of the environmental impact assessment process and ensure federal agencies fulfill their obligations under NEPA. 40 C.F.R. § 1500.3. 40 C.F.R. § 1500.3.  The CEQ has promulgated extensive regulations in furtherance of this mandate.

paragraph 16, which provides that the Settlement Agreement does not modify the discretion afforded the federal defendants under the statutes they administer or by general principles of administrative law, and by concepts of sovereign immunity, which for non-monetary actions is only waived by the APA. (Doc. #103, pp. 41-43.)

Plaintiffs respond that the Settlement Agreement imposes additional substantive obligations, which exceed NPS's obligations under NEPA. Count One, however, does not identify these additional substantive obligations or how they were breached. At oral argument counsel for the plaintiffs did not identify any additional substantive obligations, but simply asserted that the Settlement Agreement created "a very modest obligation" to do some type of supplemental environmental analysis separate and independent of that required by NEPA and its regulations. (Doc. #118, p. 10).

The language of paragraph 6 and 40 C.F.R § 1502.9(c)(1) is virtually identical. Section 1502.9(c)(1) provides that an agency "shall" prepare supplements to draft or final environmental impact statements if: "(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1). Paragraph 6 of the Settlement Agreement provided that "[s]upplemental environmental analyses of the ORV Plan will be prepared in the

future if the NPS makes substantial changes in the proposed action that are relevant to environmental concerns, or if the NPS determines that significant new circumstances or information exist relevant to environmental concerns and bearing on the proposed action or its impacts." AR 798-99. The Court finds that under its plain meaning, paragraph 6 imposes the same substantive obligations on NPS as does NEPA and the CEQ regulations.

### B. Count Two: Breach of NEPA

In Count Two, plaintiffs assert that NPS violated NEPA by reopening the trails in the BIU to ORV use without conducting the required environmental analysis. Plaintiffs contend that NPS's failure to consider and disclose the potential environmental impacts of the trail reopening in an EA, FONSI, SEIS, or EIS violated NEPA, 42 U.S.C. § 4332(2)(C), and is arbitrary, capricious, and otherwise contrary to law under the APA, 5 U.S.C § 706. (Doc. #1, ¶¶74-75.)

Defendants respond that the necessary environmental analysis was completed and recorded in the SEIS prepared in connection with the 2000 ORV Management Plan. According to defendants, no additional environmental analysis was required because NPS was merely implementing the 2000 ORV Management Plan using the adaptive management approach authorized by the plan. (Doc. #103, p. 22.)

**(1)  NEPA Requirements Generally**

NEPA declares a broad national commitment to protecting and promoting the quality of the environment, which it attempts to realize through a set of "action forcing" procedures.  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 348, 350 (1989). "NEPA essentially forces federal agencies to document the potential environmental impacts of significant decisions before they are made, thereby ensuring that environmental issues are considered by the agency and that important information is made available to the larger audience that may help to make the decision or will be affected by it." Wilderness Watch v. Mainella, 375 F.3d 1085, 1094 (11th Cir. 2004), citing Robertson, 490 U.S. at 349. "NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." Marsh v. Or. Natural Res. Council, 490 U.S. 360, 371 (1989).  NEPA imposes purely procedural requirements, rather than substantive results, Wilderness Watch, 375 F.3d at 1094, and does "not mandate any specific outcome:  agencies may make a decision that preferences other factors over environmental concerns as long as they have first adequately identified and analyzed the environmental impacts." Citizens for Smart Growth, 669 F.3d at 1211, citing Van Antwerp, 526 F.3d at 1361.

An agency initially must determine whether the action to be taken constitutes a "major federal action"-that is, an action

"significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); 40 C.F.R. § 1508.18. If the agency determines that a proposed activity is a "major federal action," the agency must prepare a detailed statement- the EIS. <u>Id.</u> When it is unclear whether a proposed activity is a "major federal action" requiring an EIS, the agency typically prepares a shorter, preliminary statement - an EA. <u>Highway J. Citizens Grp. v. Mineta</u>, 349 F.3d 938, 953 (7th Cir. 2003). An EA is a "rough-cut, low-budget EIS" which is mandated when a proposed action is neither one normally requiring an EIS nor one categorically excluded[30] from the EIS process. <u>Id.</u>; 40 C.F.R. 1501.4; 40 C.F.R. 1508.9. Among other information, the EA "provide[s] evidence and analysis that establish[es] whether or not an EIS or a Finding of No Significant Impact ('FONSI') should be prepared." <u>Id.</u> If the agency determines that a proposed activity is not a "major federal action," it must produce a FONSI, which is a document "briefly presenting the reasons why an action . . . will not have a significant effect on the human environment." 40 C.F.R. § 1508.13.

---

[30]Categorical Exclusion means a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. 40 C.F.R. § 1508.4. NPS does not assert, and the record does not establish, that NPS relied upon any categorical exclusion in making its decision to re-open ORV trails in the BIU. <u>See</u> <u>Wilderness Watch</u>, 375 F.3d at 1094-95.

**(2)  Obligation to Supplement Environmental Analysis**

While NEPA itself does not directly address post-decision supplemental environmental impact statements, the Supreme Court has held that at times NEPA requires such supplementation.  Marsh v. Or. Nat. Res. Council, 490 U.S. at 370-71; Norton v. Southern Utah Wilderness Alliance, 542 U.S. at 72-73.  "NEPA cases have generally required agencies to file environmental impact statements when the remaining governmental action would be environmentally 'significant.'"  Marsh, 490 U.S. at 371, quoting TVA v. Hill, 437 U.S. 153, 188 n.34 (1978).  The Supreme Court found that its reading of NEPA was supported by the CEQ regulations, which require a supplemental statement whenever:

> (i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or
>
> (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

40 C.F.R. § 1502.9(c)(1); Marsh, 490 U.S. at 372.

As to the first prong, an agency makes a "substantial change" to a proposed action if the change "presents a seriously different picture of the environmental impact" of the agency's action.  In re Operation of Mo. River Sys. Litig., 516 F.3d 688, 693 (8th Cir. 2008); Ark. Wildlife Fed'n v. U.S. Army Corps of Eng'rs, 431 F.3d 1096, 1102 (8th Cir. 2005).  On the other hand, a supplemental environmental statement is not required when a change is (a) simply a minor variation of an alternative previously discussed in an EIS,

or (b) qualitatively within the spectrum of alternatives that were discussed in an EIS. "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations" ["Forty Questions"], 46 Fed. Reg. 18,026, 18,035 (Mar. 23, 1981)[31]. See Russell Country Sportsmen v. U.S. Forest Serv., 668 F.3d 1037, 1045 (9th Cir. 2011); New Mexico ex rel. Richardson, 565 F.3d at 707-08; In re Operation of Mo. River Sys. Litig., 516 F.3d at 693; Dubois v. U.S. Dep't of Agric., 102 F.3d 1273, 1292 (1st Cir. 1996)); Friends of Marolt Park v. U.S. Dep't of Transp., 382 F.3d 1088, 1097 (10th Cir. 2004). An agency is required to consider both context and intensity to determine whether a change is "significant." 40 C.F.R. § 1508.27. Even a change which is beneficial to the environment may require supplementation. Russell Country Sportsmen, 668 F.3d at 1048. However, "an agency's decision to select a previously rejected alternative is not a substantial change requiring an SEIS if 'the relevant environmental impacts have already been considered.'" In re Operation of Mo. River Sys. Litig., 516 F.3d at 694 (citation omitted).

As to the second prong of § 1502.9(c)(1), not all new circumstances or information requires a supplemental environmental analysis.

---

[31]The Supreme Court has found the CEQ to be entitled to substantial deference. Robertson, 490 U.S. at 355-56. At least four circuits have adopted this CEQ guidance as a framework for applying § 1502.9(c)(1)(i). Russell Country Sportsmen v. U.S. Forest Serv., 668 F.3d 1037, 1045 (9th Cir. 2011)(citing cases).

> [A]n agency should apply a "rule of reason," . . . [A]n
> agency need not supplement an EIS every time new
> information comes to light after the EIS is finalized.
> To require otherwise would render agency decisionmaking
> intractable, always awaiting updated information only to
> find the new information outdated by the time a decision
> is made.  On the other hand, . . . NEPA does require that
> agencies take a "hard look" at the environmental effects
> of their planned action, even after a proposal has
> received initial approval.  Application of the "rule of
> reason" thus turns on the value of the new information to
> the still pending decisionmaking process.   In this
> respect the decision whether to prepare a supplemental
> EIS is similar to the decision whether to prepare an EIS
> in the first instance: If there remains "major Federal
> actio[n]" to occur, and if the new information is
> sufficient to show that the remaining action will
> "affec[t] the quality of the human environment" in a
> significant manner or to a significant extent not already
> considered, a supplemental EIS must be prepared.

Marsh, 490 U.S. at 373-74.  See also Norton, 542 U.S. at 72-73;

Sierra Club v. U.S. Army Corps of Eng'rs., 295 F.3d 1209, 1215-16

(11th Cir. 2002); Klamath Siskiyou Wildlands Ctr. v. Boody, 468

F.3d 549, 560 (9th Cir. 2006).  A decision as to what constitutes

"significant" new information is a factual issue to which a court

gives considerable deference.  Town of Winthrop v. F.A.A., 535 F.3d

1, 8 (1st Cir. 2008).

     In projects where a broad EIS has already been prepared,

agencies are encouraged to "tier" any subsequent environmental

analyses.  40 C.F.R § 1502.20.  Tiering basically allows an agency

to prepare a limited or site-specific environmental analysis and

incorporate by reference issues discussed in the broader statement.

Id.  "Tiering is appropriate when the sequence of statements or

analyses is . . . [f]rom a program, plan, or policy environmental

impact statement to a program, plan, or policy statement or analysis of lesser scope or to . . . a site-specific statement or analysis." 40 C.F.R. § 1508.28; see also New Mexico ex rel. Richardson, 565 F.3d at 717 n.40 ("When an agency begins by analyzing the impacts of an area-wide management scheme, and the implementation of that scheme will lead to many individual smaller-scale impacts not yet considered, tiering is unquestionably appropriate."). Subsequent analyses may involve the preparation of a new EIS, an SEIS, or simply an EA/FONSI. See, e.g., Headwaters, Inc., v. BLM, 914 F.2d 1174 1178 (9th Cir. 1990)(finding that proposed site-specific action was encompassed by original EIS, and SEIS was not required; EA was sufficient).

**(3) Standard of Review for Alleged NEPA Violations**

Agency decisions allegedly violating NEPA are reviewed under the APA. Citizens for Smart Growth, 669 F.3d at 1203. A court may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Citizens for Smart Growth, 669 F.3d at 1210.[32] This is an "exceedingly deferential" standard, Citizens for Smart Growth, 669 F.3d at 1210, and "a court is not to substitute its

---

[32]At one time, the Eleventh Circuit had applied a "reasonableness" standard of review, but this was rejected in favor of the arbitrary and capricious standard set forth in the APA. North Buckhead Civic Assn. v. Skinner, 903 F.2d 1533, 1538 (11th Cir. 1990), citing Marsh v. Oregon Nat. Res. Council, 490 U.S. 360 (1989). See also Hill v. Boy, 144 F.3d 1446, 1450 n.9 (11th Cir. 1998).

judgment for that of the agency." <u>Judulang v. Holder</u>, 132 S. Ct. 476 (2011)(citations omitted). Judicial review is not toothless, however.

> Agencies . . . have expertise and experience in administering their statutes that no court can properly ignore. But courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking. When reviewing an agency action, we must assess, among other matters, whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. That task involves examining the reasons for agency decisions—or, as the case may be, the absence of such reasons.

<u>Judulang</u>, 132 S. Ct. at 483-84 (citations and internal quotation marks omitted).

This is also the standard used to review an agency's decision as to whether to supplement an environmental statement under NEPA. <u>Marsh</u>, 490 U.S. at 375, 378; <u>Russell Country Sportsmen</u>, 668 F.3d at 1044. A court looks to see whether an agency took a "hard look" at the environmental consequences of its proposed action. <u>Smart Growth</u>, 669 F.3d at 1211. "An agency has met its 'hard look' requirement if it has examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." <u>Sierra Club</u>, 295 F.3d at 1216 (internal quotation marks and citation omitted).

The party challenging the decision has the burden of showing by a preponderance of the evidence that the agency did not comply

with NEPA's procedural requirements.    Smart Growth, 669 F.3d at

1211.

> The court will overturn an agency's decision as arbitrary
> and capricious under "hard look" review if it suffers
> from one of the following: (1) the decision does not rely
> on the factors that Congress intended the agency to
> consider; (2) the agency failed entirely to consider an
> important aspect of the problem; (3) the agency offers an
> explanation which runs counter to the evidence; or (4)
> the decision is so implausible that it cannot be the
> result of differing viewpoints or the result of agency
> expertise.

Sierra Club, 295 F.3d at 1216.    See also Miccosukee Tribe of

Indians v. United States, 566 F.3d 1257, 1264 (11th Cir. 2009).

"The agency need not have reached the same conclusion that the

reviewing court would reach; the agency must merely have reached a

conclusion that rests on a rational basis." City of Oxford, Ga. v.

F.A.A., 428 F.3d 1346, 1352 (11th Cir. 2005), citing Sierra Club,

295 F.3d at 1216.

If the agency follows the process required by NEPA in deciding

whether to take the action, even a capricious substantive decision

will not violate NEPA because "NEPA merely prohibits

uninformed-rather than unwise-agency action."   Van Antwerp, 526

F.3d at 1361-62 (quoting Robertson v. Methow Valley Citizens

Council, 490 U.S. 332, 350-51 (1989)(footnote omitted)).  To

paraphrase City of Oxford, 428 F.3d at 1352, this Court reviews the

NPS decision to open ORV trails in the Bear Island Unit only to

determine whether the NPS adequately assessed the impact in

accordance with statutory requirements and reached rational conclusions based on the evidence gathered.[33]

### C. Breach of Settlement Agreement and/or Violation of NEPA

This brings us, at long last, to the issue of whether NPS's 2007 decision to reopen trails in the BIU breached the Settlement Agreement and/or violated NEPA. The administrative record establishes, and it is undisputed (Responses to Request for Admissions, Doc. #95-14, p. 8), that NPS did not perform a formal NEPA review in connection with its 2007 decision to expand ORV trails in the BIU. The administrative record also establishes, and it is again undisputed (Id. at pp. 8-9), that NPS did not allow the type of formal public participation required by NEPA and paragraph 6 of the Settlement Agreement. The disputed issue is whether NPS was required to do either, or whether the environmental analysis NPS did perform was sufficient.

---

[33]There is a nuance with the standard of review in this case, given the Court's finding that the Settlement Agreement obligates defendants to comply with the NEPA procedures as a matter of contract. While a court employs the deferential APA standard of review to an administrative record to determine compliance with NEPA, compliance with a contractual obligation is usually reviewed *de novo* on the litigation record. The parties have continually disputed whether the case is limited to the administrative record, and the Court has consistently found that the breach of contract claim is not confined to the administrative record. (Docs. #94, 74, 73, 56, 54.) As it turns out, the Court need not decide whether a *de novo* standard applies to the breach of contract claim in this case because, for the reasons set forth below, non-compliance with NEPA and the Settlement Agreement is established even when review is limited to only the administrative record and application of the deferential standard.

**(1)  Positions of the Parties**

As discussed earlier, the CEQ regulations require a supplemental statement whenever "the agency makes substantial changes in the proposed action that are relevant to environmental concerns" or "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1)(i), (ii).  Plaintiffs assert that a comparison of the trail maps in 2000 and 2007 is sufficient to demonstrate that the 2007 decision to re-open ORV trails in the BIU made "substantial" changes in the 2000 ORV Management Plan that are relevant to environmental concerns.  Alternatively, plaintiffs assert that the February, 2007 decision to reopen trails caused severe and permanent environmental damage, which constituted "significant new circumstances or information" and triggered NPS's obligation under the Settlement Agreement to prepare supplemental environmental analyses. Plaintiffs also assert that the 2007 decision was never vetted by the public as required by the Settlement Agreement, and that because no supplemental NEPA analysis was conducted, there was no meaningful involvement of the public pursuant to NEPA and the CEQ regulations.  (Doc. #95, pp. 22-23).

Defendants respond that the environmental analysis done in connection with the 2000 ORV Management Plan was sufficient to support its 2007 decision to reopen trails in the BIU, and that no

additional analysis was required under NEPA or the Settlement Agreement. According to defendants, NPS's 2007 decision was contemplated by the 2000 ORV Management Plan, and was merely the result of the "adaptive management" approach required by the 2000 ORV Management Plan. Further, NPS contends that it actually went beyond its legal or contractual obligations by (1) creating a team of three staff members to look into development of trails in the BIU, (2) performing "ground-truthing" of the relevant areas, and (3) receiving written and oral public comment at the August 15, 2006 scoping meeting. (Doc. #103, pp. 25-26.)

**(2) "Relevant to Environmental Concerns" Requirement**

Both prongs of § 1502.9(c)(1) require agency action which is "relevant to environmental concerns." The administrative record is abundantly clear that the 2007 expansion of the Bear Island Unit ORV trails is "relevant to environmental concerns" under any definition of the phrase under § 1502.9(c)(1)(i) and (ii).

**(3) "New Circumstances or Information" Requirement**

The Court addresses plaintiffs' alternative argument first. Plaintiffs assert that the February, 2007 decision to reopen trails caused severe and permanent environmental damage, which constituted "significant new circumstances or information" and triggered NPS's obligation under the Settlement Agreement (and NEPA) to prepare supplemental environmental analyses. As support, plaintiffs point to post-February, 2007 photographic evidence, the testimony of NPS

employees, and the subsequent closing of one of the re-opened trails because of the damage caused by ORV use.  (Doc. #95, pp. 21-22; #95-8, 95-9, 95-10, 95-15, 95-16, 95-18, 95-19, 95-20.)

This argument relies on evidence which only came into existence <u>after</u> the February, 2007 decision.  Such post-decision evidence cannot retroactively constitute new circumstances or information as to the already-made decision.  While the evidence may show damage caused by the decision, which may justify or compel supplemental environmental analysis in the future, it does not demonstrate that the February, 2007 decision required supplemental environmental analysis before it was made.  The Court rejects plaintiffs' arguments to the contrary.

**(4)  "Substantial Changes" Requirement**

Plaintiffs argue that the 2007 decision to re-open ORV trails in the BIU made substantial changes in the 2000 ORV Management Plan that are relevant to environmental concerns, and therefore required supplemental environmental analysis.  NPS responds that its action was authorized by the 2000 ORV Management Plan without further environmental analysis, but that in any event it performed additional environmental analysis.  NPS essentially frames the case as in <u>Southern Utah Wilderness Alliance</u>:  "Before addressing whether a NEPA-required duty is actionable under the APA, we must decide whether NEPA creates an obligation in the first place." <u>Southern Utah Wilderness Alliance</u>, 542 U.S. at 72.

The CEQ regulations require a supplemental environmental analysis whenever "the agency makes substantial changes in the proposed action that are relevant to environmental concerns." 40 C.F.R. § 1502.9(c)(1)(i). The Court has already found that the decision to reopen ORV trails in the Bear Island Unit was "relevant to environmental concerns." The Court also concludes that the administrative record shows the decision constituted "substantial changes" in the 2000 ORV Management Plan which required supplemental environmental analysis.

The 2000 ORV Management Plan contemplated closing and opening ORV trails and areas within the BIU. The 2000 ORV Management Plan and its SEIS considered the environmental impact of ORV trails and found that the BIU could sustain approximately 30 miles of primary trails, not the then-existing 54-55 miles. Additionally, the ORV plan and SEIS contemplated that the BIU could sustain short secondary trails which would "branch off the primary trails and would receive less use." AR 903. The 2000 ORV Management Plan did not designate specific trails for closure, but provided a conceptual framework for doing so which contemplated the use of adaptive management techniques to continually evaluate trails, both for closings and openings. Thus, the 2007 decision to open primary trails and secondary trails in the BIU was qualitatively within the spectrum of alternatives considered in the 2000 SEIS.

As a result of the extensive NEPA review performed in connection with the 2000 ORV Management Plan and SEIS, the "Green

Trail", "Blue Trail," "Yellow Trail" and part of the "Red Trail"
were closed.  AR 6489.  As a result of these trail closings, the
designated trails in the BIU were reduced to about 23 miles of
primary trails and 0.34 miles of secondary trail.  AR 1752.  The
2007 decision reopened approximately 11 miles of these same primary
trails and designated approximately 9.4 miles of secondary trails.
AR 1766.

Defendants argue that the 2000 ORV Management Plan placed no
limit on secondary trails and, therefore, increasing these trails
30-fold was within the contemplation of the plan.  The plan and
SEIS allowed for secondary trails for public recreational use
accessing specific destinations such as designated campsites.  AR
903.  NPS does not identify the "specific destinations" the 9.4
miles of secondary trails access, but it appears from the record
that they are functionally primary trials which dead-end in
locations used for hunting.  This returns the BIU trail network to
approximately 44 of the 55 miles of trails previously existing in
the BIU, a result which is contrary to the ORV Plan and the SEIS.
This is not the type of "specific destination", with limited
ingress and egress, contemplated by the prior SEIS.  Additionally,
to the extent NPS implies that the ORV plan and the prior SEIS
allowed for recreational ORV use on secondary trails (i.e., general
off-road driving), the Court disagrees.

Therefore, the Court concludes that NPS was required to perform a supplemental environmental analysis prior to re-opening the BUI ORV trails in 2007.

**(5) Substantial Compliance With NEPA**

Having determined that defendants were required to perform supplemental environmental analysis, the Court now considers whether the environmental analysis NPS performed in 2006-07 was the functional equivalent of a NEPA review and, therefore, sufficient.[34] See, e.g., Mainella, 375 F.3d at 1096 (acknowledging that a NEPA violation may be harmless when the relevant decision makers actually engaged in significant environmental analysis prior to the decision but failed to comply with the exact procedures mandated)(citing cases).

Based upon the pre-2007 administrative record alone, the Court finds that NPS has failed to establish a "rational connection between the facts found and the choice made." Sierra Club, 295 F.3d at 1216; see also Motor Vehicle Mfrs. Ass'n, 463 U.S. at 50

---

[34]Based upon the administrative record, it appears that NPS initially intended to engage in a formal NEPA review, but then failed to do so. On multiple occasions, NPS expressed an intention to prepare an EA and informed environmental interests that the decision to reopen the trails involves a long "labor intensive" process that requires additional studies. AR 1297, 1413. Nothing in the record, however, indicates that NPS conducted such studies prior to its decision. The record also includes references to new information that appears to militate against reopening the trails (e.g., panther-human incidents are on the rise, panther habitat in Florida has decreased, the BIU may be more important to panthers now than ever before), AR 1481-82, but NPS failed to address this information specifically.

("It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.").

NPS is correct that the 30-mile limit stated in the 2000 ORV Management Plan was approximate and that the plan contemplated that "[the] lengths could change as better data become available."  AR 903.  NPS, however, has not identified what "better data" became available between 2000 and 2007.  The Janis and Clark study which defendants heavily rely upon simply cannot be considered "new" data.  The study was performed in 1999.  Defendants' counsel admitted at oral argument that the research was the same and that the only way in which the study was "new" was that it was published and peer-reviewed in 2002.  (Doc. #118, p.72.)  Publication of data already relied upon does not make the data "new."

It is also true that the 2000 ORV Management Plan and SEIS contemplated that NPS would implement the plan in three phases over ten years using an "adaptive management approach" which involved continued review and modification of the plan.  This review and modification would depend on "existing data, new information from scientific research and monitoring, and input from NPS staff and other individuals who are familiar with the preserve."  AR 897.  The Court does not agree that the ground-truthing project and the comments received from the 2006 scoping meeting constitute "scientific research and input".  While it is certainly possible that NPS's "ground-truthing" revealed data which demonstrated that the reopened primary trails and newly designated secondary trails

would have no significant impact on the environment, the record does not reflect such data and how it was used.  NPS fails to specify what specific information its staff uncovered and how that information supports the 2007 decision.

An agency decision which is explained "with less than ideal clarity" should be upheld "if the agency's path may reasonably be discerned."  Alaska Dep't of Envtl. Conservation v. E.P.A., 540 U.S. 461, 497 (2004).  Here, however, the administrative record does not reveal either the specific data or the path of NPS's reasoning with regard to the 2007 decision.[35]

Finally, NPS's 2007 decision first reopened the trails and then committed to performing a study of ORV impacts in the Preserve.  NPS obtained funding for a proposed interagency scope of work (SOW) to be performed jointly with FWS in 2008.  AR 6840-6844.  NEPA requires the agency to perform such studies *before* making a decision with environmental impacts.  See Mainella, 375 F.3d at 1096 ("NEPA imposes procedural requirements *before* decisions are made in order to ensure that those decisions take environmental consequences into account.")

The Court finds that the administrative record does not reflect a rational basis for NPS's 2007 decision to reopen trails

---

[35]See also Idaho Conservation League v. Guzman, 766 F. Supp. 2d 1056, 1068 (D. Idaho 2011)(acknowledging that an agency's *post hoc* justifications which are missing from the record puts the court in the awkward position of interpreting maps and scientific data it lacks the expertise to interpret).

in the BIU and, as such, the decision was arbitrary and capricious and a violation of NEPA.  Summary judgment is granted in favor of plaintiffs as to Counts One and Two.

**D.    Count Three:  Big Cypress Establishment Act, National Park Service Organic Act, and the 2000 ORV Management Plan**

In Count Three, plaintiffs assert that the expanded ORV use in the BIU will have substantial and irreversible impacts on the soils, hydrology, and wildlife of the Preserve and will impair recreational use of the Preserve.  (Doc. #1, ¶79)[36].  Because of this, plaintiffs assert that reopening the BIU trails violates NPS's mandates under the Big Cypress Establishment Act and the National Park Service Organic Act of 1916, and is arbitrary, capricious, and otherwise contrary to law, in violation of the APA, 5 U.S.C. § 706. (Doc. #1, ¶79.)[37]

Compliance with the Big Cypress Establishment Act and the Organic Act is reviewed under the arbitrary and capricious standard of the APA.  See, e.g., Wymoning v. U.S. Dep't of Agric., 661 F.3d 1209, 1226.  Expansion of ORV use in the Preserve does not inherently violate either the Establishment Act or the Organic

---

[36]At oral argument, plaintiffs suggested the Court should avoid reaching the merits of the other counts if they prevailed on the NEPA claim.  The Court declines this invitation because it may result in piecemeal litigation.

[37]Plaintiffs also assert that the re-opening of the BIU trails violates the 2000 ORV Management Plan and represents an arbitrary and capricious reversal of the NPS's 2000 decision on how to fulfill its statutory duties.  (Id. at ¶¶ 79, 80).  This claim is simply a re-statement of the claims in Counts One and Two, and therefore will not be further discussed.

Act.  Because the Court finds that the administrative record does not reflect a rational basis for NPS's 2007 decision to reopen trails in the BIU, plaintiffs will be granted summary judgment on Count Three.

**E. Count Four: Violation of Executive Orders 11,644 and 11,989**

In Count Four, plaintiffs allege that NPS's action in reopening the BIU trails failed to properly control and direct ORV use so as to protect the resources of the Preserve, to minimize damage to soil, water flow, vegetation, wildlife, wildlife habitat, or other resources such as cultural or historic resources, to minimize harassment to wildlife or significant disruption of wildlife habitat, and to provide adequate opportunity for public participation.  (Doc. #1, ¶84).  NPS's actions, plaintiffs allege, are therefore in violation of the requirements of Executive Orders 11,644 and 11,989, and are arbitrary, capricious, and otherwise contrary to law, in violation of the APA, 5 U.S.C. § 706.  (Id.)

Neither Executive Order 11,644 nor 11,989 create a private cause of action.  However, in certain circumstances, judicial review is available under the APA to challenge final agency action or inaction that violates an executive order.  City of Carmel-by-the-Sea v. U.S. Dep't of Transp., 123 F.3d 1142, 1166 (9th Cir. 1997).  Plaintiffs may challenge agency action under an executive order if the executive order meets three requirements: First, the executive order must have a "specific statutory foundation"  Id.

If an executive order has a specific statutory foundation, it is given the effect of a congressional statute. See City of Albuquerque v. U.S. Dep't of Interior, 379 F.3d 901, 913 (10th Cir. 2004)(citing cases). Second, neither the statutory foundation nor the executive order itself must preclude judicial review. 5 U.S.C. § 701(a)(1). Third, there must be "law to apply"-that is, there must be an objective standard by which a court can judge the agency's actions. See 5 U.S.C. § 701(a)(2); Heckler v. Chaney, 470 U.S. 821, 830 (1985). If an executive order meets these requirements it can be enforced through judicial action. City of Carmel-by-the-Sea, 123 F.3d at 1166.

Here, the executive orders at issue rest upon NEPA.[38] Neither NEPA nor the orders themselves preclude judicial review, and the executive orders outline objective standards by which the Court can judge NPS's actions. Thus, the conduct is subject to judicial review for compliance with Executive Orders 11,644 and 11,989 under the APA standard of review. See City of Carmel-by-the-Sea, 123 F.3d at 1166 (finding that agency compliance with executive orders was subject to judicial review under the APA because the orders were issued in furtherance of NEPA, among other statutes); S. Utah Wilderness Alliance v. Sierra, No. 1:08-cv-195, 2008 WL 4643003, at *3 n.3 (D. Utah Oct. 20, 2008)(finding Executive Order 11,644 and

---

[38]Both Executive Order 11,644 and Executive Order 11,989 state that the directives therein are "in furtherance of the purpose and policy of the National Environmental Policy Act". See 37 Fed. Reg. 2877; 42 Fed. Reg. 26959.

Executive Order 11,989 can be enforced under the APA); W. Watersheds Project v. Bureau of Land Mgmt., 629 F. Supp. 2d 951, 966-67 (D. Ariz. 2009)(collecting cases).

Executive Orders 11,644 and 11,989 provide that each respective agency head shall develop and issue regulations and administrative instructions regarding ORV trails, and that the designation of ORV areas and trails shall be in accordance with the following relevant criteria:

> (1) Areas and trails shall be located to minimize damage to soil, watershed, vegetation, or other resources of the public lands.

> (2) Areas and trails shall be located to minimize harassment of wildlife or significant disruption of wildlife habitats.

37 Fed. Reg. 2877 § 3(a)(1),(2).

As summarized earlier, under the APA agency action is "arbitrary or capricious" if the agency has failed to articulate a "rational connection between the facts found and the choice made." Sierra Club, 295 F.3d at 1216. In the instant case, NPS has failed to articulate whether or how it applied the minimization criteria to the 2007 decision. The use of ORVs will necessarily affect the soil, vegetation, wildlife, wildlife habitat and resources of a particular area. NPS has failed to cite to substantive evidence in the record which demonstrates that the decision to reopen trails was made with the objective of minimizing impacts. The Court finds the decision to reopen the trails was therefore arbitrary and

capricious.  See Idaho Conservation League, 766 F. Supp. 2d at
1071-74 (finding that agency's failure to identify whether or how
it applied minimization criteria violated executive orders 11,644
and 11,989).  Plaintiffs are, therefore, entitled to summary
judgment as to Count Four.

### F.  Counts Five, Six: ESA and the Amended Biological Opinion

In Counts Five and Six, plaintiffs allege that NPS and FWS
violated the ESA.  (Doc. #1, ¶¶ 83-88.)  In 2000, FWS reviewed a
draft of the ORV Management Plan and issued a biological opinion
(the 2000 Biological Opinion) related to the endangered Florida
panther.  In 2007, six months after NPS reopened trails in the BIU,
FWS issued an amendment to its original opinion (the 2007 Amended
Opinion).  Plaintiffs contend that FWS's 2007 Amended Opinion is
arbitrary and capricious and should be set aside.  Plaintiffs
further argue that NPS's reliance on the Amended Opinion is
unlawful.

### (1) ESA Requirements Generally

Section 7 of the ESA requires that federal agencies consult
with FWS to ensure that actions the agency authorizes are not
likely to jeopardize the continued existence of species listed as
"threatened" or "endangered," or adversely modify or destroy
habitat designated as critical to the survival of a listed species.
16 U.S.C. § 1536.  If the proposed action may affect a listed
species, formal consultation between the agency and the FWS is

required.  Id.; 50 C.F.R. § 402.14.  When formal consultation is initiated, the agency is required to provide the FWS information about the proposed project and the "best scientific and commercial data available."  50 C.F.R. § 402.14(d).  The FWS then prepares a biological opinion addressing whether the action will jeopardize the species.  Id.

The ESA prohibits the "take" of any endangered species, and it defines "take" to include "harm," which in turn includes "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering."  16 U.S.C. § 1532(19); 50 C.F.R. § 17.3.  If the proposed action will not jeopardize the species but still might result in incidental harm to it, FWS attaches to the biological opinion an Incidental Take Statement (ITS) establishing the terms and conditions under which the incidental take may occur.  50 C.F.R. § 402.14(i); Miccosukee Tribe of Indians, 566 F.3d at 1263. (11th Cir. 2009).

Re-initiation of formal consultation is required and shall be requested by the Federal agency or by the Service where discretionary Federal involvement or control over the action has been retained or is authorized by law and:

> If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion.

50 C.F.R. § 402.16 (c).

**(2) FWS's 2000 Biological Opinion**

As discussed earlier, <u>see</u> pages 18-19, prior to NPS's adoption of the 2000 ORV Management plan, it formally consulted with FWS regarding ORV use and its potential effect on the endangered Florida panther. On July 14, 2000, the FWS issued its 2000 Biological Opinion concluding that implementation of the plan may cause an "incidental take" of the panther in the form of harassment, AR 1116, but "is not likely to jeopardize the Florida panther." AR 1115, 1117. In an Incidental Take Statement (ITS), FWS required NPS to comply with six non-discretionary terms and conditions, including:

> (1) reducing the extent of trails in Bear Island and employing designated trails in the rest of the Preserve,
>
> (2) studying the level of ORV use in Bear Island to determine the level that is acceptable and compatible with panther use,
>
> (3) continue panther monitoring and initiate a study concurrent with the ORV carrying capacity and level of use study,
>
> (4) provide FWS with copies of studies performed on panther use and related ORV investigations,
>
> (5) implement specific studies of the effects of the action on Preserve panthers and determine the ORV carrying capacity for management units within the Preserve, and
>
> (6) notify FWS upon locating dead, injured or sick panthers. AR 1117-18.

**(3)  FWS's 2007 Amended Biological Opinion**

The July 13, 2006 Memorandum from NPS's Resource Management Chief discussed FWS's 2000 Biological Opinion and noted FWS's concern that ORV use would increase human presence in the Preserve and result in increased disturbance of the panther population.  The Resource Management Chief also noted that the 2000 ORV Management Plan contemplated that 31 separate projects would be undertaken to discover any impacts resulting from management actions and ORV use, but none of these projects were completed.  (Doc. #61-5, Exh. 4).

In the February 15, 2007, letter to the FWS, NPS stated it was "currently working on finishing the trail system in the Bear Island management unit."  AR 1752.  Superintendent Gustin stated NPS was working on adding approximately 11 miles of primary trails in the BIU to the then-current 23 miles, and adding approximately 7 miles of secondary trails to the current 0.34 miles.  Id.  She then described a series of four actions that NPS committed to undertake to implement the terms and conditions of the July 14, 2000 Biological Opinion, including the initiation of a carrying capacity study for the BIU, development of a scope of work (SOW) on evaluating the impacts of ORV use on panther movement, collection and analysis of use data, and periodic review of habitat conditions adjacent to trails through a habitat checklist and photo monitoring points.  AR 1753.  Superintendent Gustin requested Mr. Souza's concurrence that the 2007 proposed trail designations at the BIU

were consistent with the terms and conditions of the 2000 Biological Opinion. AR 1753-54, 1758.

The next day, Field Supervisor Souza wrote Superintendent Gustin confirming that the commitments outlined in NPS's letter were sufficient to demonstrate NPS's intention to implement the ITS and the terms and conditions of the 2000 Biological Opinion with respect to the BIU. AR 1758-61. On February 21, 2007, NPS issued an order reopening the trails in the BIU.

On September 19, 2007, FWS issued its 2007 Amended Opinion. AR 2043-2095. In the Amended Opinion, FWS concluded that the new ORV trail designations would likely have a "minor" effect on panthers in light of the fact that "[p]anther locations during the hunting season in Bear Island were on average, only 180 meters (m) farther from trails than before the hunting season. An increase of 180 m probably has minor biological consequences." In reaching this conclusion, FWS relied on the same study it relied upon in 2000 – the Janis and Clark study conducted in 1999. The 2007 Amended Opinion also amended the six "non-discretionary" terms and conditions outlined in the 2000 opinion/ITS.[39] AR 2073.

_____

[39]In replacing the terms and conditions from the 2000 Biological Opinion, FWS stated that part of term and condition 1 had been completed because NPS reduced the extent of trails in the BIU from 55 miles of primary trail to a designated trail system of 34.95 miles of primary trail and 9.41 miles of secondary trail. Prior to the 2007 change, NPS had a BIU trail system of approximately 23 miles of primary trials and 0.34 mile of secondary trails.

## (4) ESA Violation

Generally, a court must be "at its most deferential" when reviewing scientific judgments and technical analyses within an agency's expertise. N. Plains Resource Council, Inc. v. Surface Transp. Bd., 668 F.3d 1067, (9th Cir. 2011) (quoting Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 103 (1983)). But, as stated previously, a failure by the agency to articulate a rational basis for its decision renders the decision arbitrary and capricious. City of Oxford, Ga., 428 F.3d 1346; Sierra Club, 295 F.3d 1209.

In 2000, FWS concluded that an approximate limit of 30 miles of primary trails and short secondary trails in the BIU would cause some incidental take of the Florida panther. This "take" was allowed only if NPS completed several studies related to ORV use and its impacts. In 2007, FWS concurred with NPS's decision to designate approximately 20 additional miles in the BIU without any "new" information.[40] Although FWS notes that "no clear schedule was

---

[40]Although FWS states that the biological opinion was amended because of "continuing discussions and new information presented," AR 2045, defendants do not cite to any "new" data. The initial opinion relied upon the 1999 Janis and Clark study (published in 2002), among other research, to conclude that the ORV effects on panthers would be "minor." FWS relies on this same study in its amended 2007 opinion. Additionally, defendants characterize an increase in panther numbers between 2000 and 2006 (from 62 to 97 panthers, AR 2049 and 2072) as "new" data, but the fact that panther numbers would increase was known in 2000. The cause of the increase was the 1994 introduction of eight female Texas panthers into the population. Finally, to the extent FWS cites the SOW as "new" data, that information was obtained *after* FWS concurred in
(continued...)

set for particular studies," AR 2044, not a single study was completed between 2000 and 2007. Thus, in 2000, one set of scientific data caused FWS to reach a certain conclusion, and in 2007 essentially the same set of data caused FWS to reach a significantly different conclusion. Such action is the very definition of "arbitrary and capricious" unless explained by FWS. No reasonable explanation is contained in the record.

FWS's 2007 Amended Opinion appears to be simply a *post hoc* justification rather than a reasoned scientific judgment. Just days before issuing its decision to reopen the trails, NPS consulted with FWS and asked the agency to concur in its assessment that reopening the trails was consistent with the 2000 Biological Opinion. The following day, FWS concurred with NPS's conclusions. FWS simply stated that NPS's commitment to perform studies in the future was sufficient to demonstrate that NPS intended to implement the ITS and the terms and conditions of the 2000 Biological Opinion. FWS then waited several months before issuing its Amended Opinion. At that point, the trails had been reopened for approximately six months. The ESA, like NEPA, does not allow agencies to act first, study later. See, e.g., Connor v. Burford, 848 F.2d 1441, 1453 (9th Cir. 1988)(noting that biological assessments under the ESA must be performed prior to the implementation of the agency action).

---

[40](...continued)
NPS's decision to reopen the trails.

Plaintiffs also argue that FWS's Amended Opinion lacks a rational basis because it failed to consider the "current status of the listed species." 50 C.F.R. § 402.14. FWS based its 2007 Amended Opinion on the environmental baseline which existed in 2000. FWS responds that it did not reassess the status of the Florida panther because it was not required to do so. According to FWS, such an analysis is required only when the agency is issuing a biological opinion, not when it is merely amending an already existing opinion. (Doc. #103, p. 35.) Additionally, defendants argue that there is nothing in the record to support plaintiff's assertion that the trails designated by NPS in 2007 will result in "significantly increased hunting."[41] Defendants argue that the overall effect of hunting under the 2007 designation remains the same as the 2000 designation because the number of allowed permits is the same and the number of miles of ORV trails remains lower than what it was before the 2000 ORV Management Plan. (Id., p. 37.)

The Court disagrees with the FWS arguments. The number of miles and the number of permits are not dispositive of the trails' effects. In the instant case, NPS's 2007 proposed action involved the addition of approximately 9.4 miles of "secondary" trails. Although the record does not identify the "specific destinations" of these trails, it appears that they simply lead to hunting areas.

---

[41]Research cited in the 2000 ORV Management Plan indicated that hunting may negatively affect panthers in the BIU. AR 967.

FWS's Amended Opinion does not include an analysis of the locations of these trails and whether their placement and anticipated level of use would affect the endangered panther. FWS merely states that the total number of trails is less than what it was pre-2000. If FWS had various scientific or technical justifications for its Amended Opinion, the record does not reflect a rational basis for its change of position in 2007. See Motor Vehicle Mfrs. Ass'n, 463 U.S. at 57 ("An agency's view of what is in the public interest may change, either with or without a change in circumstances. But an agency changing its course must supply a reasoned analysis . . .").

Therefore, the Court finds that FWS's Amended Opinion was arbitrary and capricious and violated the ESA. Summary judgment is granted in favor of plaintiffs as to Counts Five and Six.

## IV. Remedy

The APA provides that a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A)(D). Thus, when a court finds an agency action is not in accordance with the law, the action is deemed invalid and the agency returns to the pre-decision status quo. Van Antwerp, 526 F.3d at 1369 (Kravitch, J., concurring in relevant part)(acknowledging that vacatur of unlawful agency action is the ordinary APA remedy).

Notwithstanding this mandate, defendants contend that the Court should not set aside the 2007 trail designation. Instead, defendants primarily contend that the Court should exercise discretion and remand this matter without vacating the agency decision because setting aside the decision "would disrupt measures under the 2007 designation which provided for reclaiming 3.11 miles of primary trail. . .[and] would result in resumption of ORV use in these areas where ORV use has been prohibited for the past five years." (Doc. #120, p. 3.) Defendants further contend that setting aside the 2007 decision will present "administrative burdens associated with reconfiguring the current trail system to conform to the 2000 Interim Map and informing the public regarding trail openings and closures." (Id. at p. 4.) Finally, defendants aver that the Court should not set aside the decision so the public can continue to use the trail system. (Id.)

The plaintiffs have neither challenged the 2007 designation as a whole nor have they requested that the 2007 designation be set aside in its entirety. The Complaint specifically states that "[t]his suit challenges the decision by [NPS] in February 2007 *to re-open* off-road vehicle ("ORV") trails in the Bear Island unit of Big Cypress National Preserve . . . in southern Florida." (Doc. #1, ¶1)(emphasis added). Plaintiffs' complaint makes no request to completely set aside NPS's 2007 decision and instead requests that the Court "[e]njoin NPS from permitting use of the *re-opened* trails

in the Bear Island unit by ORVs until Defendants comply fully with all applicable laws." (Doc. #1, Prayer for Relief, ¶5)(emphasis added). Thus, the Court has no basis under the APA to set aside NPS's decision to re-claim the 3.11 miles of primary trail.

The Court is not persuaded that setting aside the relevant portions of the 2007 decision would create an undue administrative burden. In 2007, a letter dated October 16, 2000, and effective just eight days later on October 24, 2000, informed the public of the trail changes resulting from the 2000 plan. AR 1178-81. In 2007, when NPS decided to re-designate trails within the BIU, NPS issued a press release as to the relevant changes on February 21, 2007. The changes implemented were effective seven days later on February 28, 2007. AR 1766-73. There is no evidence that in either 2000 or 2007 undue administrative burdens resulted from these actions. The Court will, however, provide the defendants with fourteen days to comply with this Opinion and Order to assist the defendants with implementing the requisite trail closures.

The Court is also not persuaded by defendants' argument that the Court should not set aside NPS's decision to re-open trails so the trails may remain open for public enjoyment. There is simply no case law to support that this is a sufficient reason to ignore the clear mandate from the APA to set aside arbitrary and capricious agency action.[42]

_____

[42]Defendants have also represented that since the 2007
(continued...)

Simply stated, NPS's decision to convert 1.58 miles of primary trail to secondary trail, to re-open 15.21 miles of primary trail, and 7.49 miles of secondary trails was arbitrary and capricious and is therefore set aside pursuant to 5 U.S.C. § 706(2)(A)(D). Any portions of these trails which remain open must be closed within fourteen days of this Opinion and Order. In addition, because the Court finds the FWS's 2007 Amended Opinion arbitrary and capricious, it too is set aside, effective immediately.

Accordingly, it is now

**ORDERED:**

1. Plaintiffs' Dispositive Motion for Summary Judgment (Doc. #95) is **GRANTED.**

2. Federal Defendants' Cross Motion for Summary Judgment (Doc. #103) is **DENIED.**

3. NPS's 2007 trail designation, to the extent it re-designated 1.58 miles of primary trails to secondary trails and re-opened 15.21 miles of primary trails and 7.49 miles of secondary trails is hereby **SET-ASIDE.** Any portions of these trails which

---

[42] (...continued)
decision, NPS has closed 7.32 miles of primary and 1.63 miles of secondary trails in the BIU and therefore the Court need not fashion a remedy as to these trails. Defendants have further represented that they will halt any actions related to reopening these trails pending completion of any Court-ordered actions on remand. NPS's decision after 2007 to close parts of the re-opened trails has not been challenged by the plaintiffs and is therefore not before the Court.

remain open must be closed within **FOURTEEN** days of this Opinion and

Order.

4.   The FWS's 2007 Amended Opinion is **SET-ASIDE, EFFECTIVE**

**IMMEDIATELY.**

5   The Clerk shall enter judgment accordingly, terminate any

pending deadlines and close the file.

**DONE AND ORDERED** at Fort Myers, Florida, this __10th__ day of

July, 2012.


_____
JOHN E. STEELE
United States District Judge


Copies:
Counsel of record